MILBERG WEISS BERSHAD
  HYNES & LERACH LLP
JEFFREY W. LAWRENCE (166806)
CHRISTOPHER P. SEEFER (201197)
AZRA MEHDI (*pro hac vice*)
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)
        - and -
WILLIAM S. LERACH (68581)
401 B Street, Suite 1700
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

WEISS & YOURMAN
JOSEPH H. WEISS
551 Fifth Avenue, Suite 1600
New York, NY  10176
Telephone:  212/682-3025
212/682-3010 (fax)

Co-Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re TUT SYSTEMS, INC. SECURITIES LITIGATION | ) Master File No. C-01-2659-CW |
| | ) |
| | ) <u>CLASS ACTION</u> |
| | ) |
| This Document Relates To: | ) CONSOLIDATED CLASS ACTION |
| | ) COMPLAINT FOR VIOLATION OF THE |
| ALL ACTIONS. | ) FEDERAL SECURITIES LAWS |
| | ) |
| | ) <u>DEMAND FOR JURY TRIAL</u> |

# TABLE OF CONTENTS

**Page**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . 6

THE PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

A.  Description of the Company and Its Products . . . . . . . . . . . . . . . . . 9

B.  Tut's Revenue Was Dependent on Sales of Its Expresso Products to a Small Number of Customers . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

DEFENDANTS' SCHEME TO DEFRAUD . . . . . . . . . . . . . . . . . . . 13

A.  Defendants Caused Tut to Improperly Recognize Revenues on Sales in 2Q00 and 3Q00 of Products that They Knew Were Defective . . . . . . . . . . . . . . . . 13

B.  Defendants Caused Tut to Improperly Recognize Revenues on Contingent Sales to Its Largest Customers and Sales to Reflex, an Undisclosed Related Party . . . . . . . . . . . 16

  1.  Contingent Sales . . . . . . . . . . . . . . . . . . . . . . . . . 16

  2.  Related Party Sales to Reflex . . . . . . . . . . . . . . . . . . . . . 18

C.  Throughout the Class Period Defendants Caused Tut to Materially Overstate Earnings by Not Reporting Inventory at the Lower of Cost or Market . . . . . . . . . . . . . . . . 20

D.  Defendants Caused Tut to Materially Overstate Earnings by Not Adequately Reserving for Uncollectible Accounts Receivable . . . . . . . . . . . . . . . . . . . . . 21

FALSE AND MISLEADING STATEMENTS
DURING THE Class Period . . . . . . . . . . . . . . . . . . . . . . . . . 22

A.  Defendants' False and Misleading Statements Regarding Tut's 2Q00 Financial Results . . . 22

B.  Defendants' False and Misleading Statements Regarding Tut's 3Q00 Financial Results . . . 27

C.  Defendants' False and Misleading Statements Regarding Tut's Revised Guidance for 4Q00 Financial Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

DEFENDANTS' SCHEME UNRAVELS . . . . . . . . . . . . . . . . . . . . 36

POST CLASS PERIOR EVENTS FURTHER DEMONSTRATING
DEFENDANTS' FRAUD . . . . . . . . . . . . . . . . . . . . . . . . . . 37

TUT'S FALSE FINANCIAL REPORTING DURING THE CLASS PERIOD . . . . . . . . . 38

A.  Tut's Improper Revenue Recognition and Failure to Adequately Reserve for Accounts Receivable with Doubtful Collectibility . . . . . . . . . . . . . . . . . . . . 39

1
**Page**

2    B.    Tut's Improper Accounting for Inventory . . . . . . . . . . . . . . . . . . . . . . . . 41

3    INSIDER TRADING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

4    CLASS ACTION ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

5    STATUTORY SAFE HARBOR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

6    CLAIM FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

7    PRAYER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

8    JURY DEMAND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

1.      This is a securities fraud class action against Tut Systems, Inc. ("Tut" or the "Company") and certain of its executive officers for violation of the federal securities laws.  This action is also brought under Fed. R. Civ. P. 23, seeking certification of a class of persons and entities who purchased Tut securities between July 20, 2000 and January 31, 2001 (the "Class Period").

2.      Tut sells broadband access systems that enable service providers (including competitive local exchange carriers ("CLECs") and building local exchange carriers ("BLECs")) to deliver high-speed data access to multi-tenant buildings.  Tut's proprietary FastCopper Technology, HomeRun and LongRun Technology, permit high-speed data access over existing copper telephone lines.  In essence, Tut's products enable multi unit buildings to provide internet access to their occupants.  The Company's principal product offering, Expresso System Platforms, consists of a chassis containing management cards, interface cards and HomeRun or LongRun line cards.  In 2000, over 40% of Tut's revenues were generated by a small number of service providers including Trigem Infocom, Inc. ("Trigem"), Reflex Communications, Inc. ("Reflex") and Darwin Networks, Inc. ("Darwin") who accounted for 18%, 12% and 11% of net sales, respectively.

3.      Tut went public in 1/99 at $18 per share, selling 2.875 million shares (including the overallotment) for proceeds of $46 million.  In 3/00, Tut completed a secondary offering, selling 2.5 million shares at $60 per share for net proceeds of approximately $141.7 million.  Prior to the Class Period Tut consistently reported revenues that met or exceeded targets reported by analysts.  At the beginning of the Class Period, defendants having led the market to believe that Tut would continue to meet or beat estimates, knew that the market expected Tut to report increasing revenues and earnings per share ("EPS") during 2000.  They also knew that because the Company had essentially one product and was dependent on a small number of customers for a majority of its sales, product problems or the loss of any customers would materially and adversely impact Tut's revenue.  By the summer of 2000, Tut had problems on both fronts.

4.      Several former employees of Tut have informed plaintiffs that beginning at least in the summer of 2000, the Company had significant problems with its products that caused them to overheat and fail.  This led to the major, but undisclosed, recall at the beginning of the Class Period.  In July, defendants

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL
SECURITIES LAWS- C-01-2659-CW                                                                                      - 1 -

1   were informed by Trigem, Tut's largest customer, that it would no longer be purchasing Tut's products.

2   Other large customers were not paying Tut.  These witnesses spoke on a confidential basis and are referred

3   to herein as confidential witnesses 1-4 ("CW__").  They include a former Tut Director of Customer Service

4   ("CW1"), a former Regional Sales Manager ("CW2"), a former Customer Service Manager ("CW3"), and

5   a former Credit Manager ("CW4").  These witnesses have also informed plaintiffs that Tut's largest

6   customers received extended payment terms, were not required to pay for product until resale, and had

7   the right to return unsold product.  Internal Company documents obtained by plaintiffs (and attached to the

8   Appendix of Exhibits to the Consolidated Class Action Complaint for Violation of the Federal Securities

9   Laws ("Appendix") filed herewith) confirm that Tut's largest customers did not pay for product as required

10  by the contracts between the parties and these "sales" should not have been recognized as revenue by the

11  Company.

12       5.       CW1 and CW3 both worked at Tut's headquarters in the Company's customer support

13  division both before and during the Class Period.  Each was responsible for (1) responding to customer

14  complaints about Tut's products, (2) implementing and managing the recall, and (3) determining the causes

15  of the product defects.  CW2 worked at Tut during and after the Class Period.  As a Regional Sales

16  Manager, CW2 was responsible for selling Tut's equipment, interacting with customers and managing staff,

17  including sales representatives and sales engineers.  CW2 prepared sales reports and participated in weekly

18  sales meetings led by Tut's Vice President of Sales.  Thus, CW2 was familiar with the product problems

19  and payment terms required by the contracts between Tut and its customers, extended payments terms

20  granted to Tut's customers and the problems Tut's customers had paying Tut.  CW4 worked at Tut during

21  and after the Class Period.  As a Credit Manager, CW4 was responsible for approving credit for new

22  customers, approving customer shipments and collections for both new and existing customers.  Thus,

23  CW4 was familiar with the extended payment terms granted to Tut's customers and the problems

24  customers had paying Tut.

25       6.       Having conditioned the market to expect increased growth and earnings with widespread

26  product problems and the loss of Trigem, defendants knew that they could not meet these expectations

27  without a new, substantial source of revenue.  The new and substantial source of revenue came from a

28  sham transaction with Reflex.  Reflex had purchased approximately $1.9 million of product from Tut in the

1    first six months of 2000 pursuant to a channel partner agreement between the two companies.   The

2    agreement required Reflex to purchase $1.5 million of product in 3Q00.  On 7/14/00, two days after Tut

3    purchased 1.3 million shares of Reflex's series B private preferred stock in 7/00, Tut began shipping

4    approximately $7 million of product in 3Q00 – more than four times the amount required under the channel

5    partner agreement.  Defendants knew that this was far more product than Reflex could use or pay for, but

6    nevertheless caused Tut to recognize $7 million of revenue in 3Q00 on this sham transaction.  In fact, Tut

7    shipped product to Reflex even though Reflex had not paid for prior shipments.  Reflex never used or paid

8    for any of the product and declared bankruptcy shortly thereafter.

9         7.     Defendants' fraud principally involved (1) the concealed design and manufacturing defects

10   with the Expresso System Platforms that caused the Platforms to overheat and fail, and Tut's undisclosed

11   major recall of all Platforms in the summer of 2000, and (2) the reporting of fraudulent financial results for

12   the quarters ending 6/30/00 ("2Q00") and 9/30/00 ("3Q00").  As set forth more fully below, defendants

13   caused Tut to report inflated financial results during the Class Period by (1) improperly recognizing

14   revenues on sales of the defective product, (2) improperly recognizing revenues on contingent sales to its

15   largest customers including Trigem, Reflex and Darwin, (3) improperly recognizing revenues on the

16   undisclosed sham affiliate transaction with Reflex when Tut had no expectation of payment, (4) failing to

17   adequately reserve for uncollectible accounts receivable and (5) failing to reserve for obsolete and excess

18   inventory.

19        8.     The Class Period begins on 7/20/00, with Tut's announcement of record 2Q00 revenues

20   and its first ever proforma profit.  As a result of defendants' positive false statements Tut's stock price

21   increased 26% from $68.25 on 7/19/00 to close at $86.3125 on 7/20/00.  These financial results were

22   false and misleading because Tut improperly recognized revenues on sales of defective product that

23   customers had returned pursuant to Tut's undisclosed recall in the summer of 2000.  Additionally, Tut also

24   improperly recognized revenues on sales to its largest customers, including Trigem and Darwin which

25   accounted for 33% and 14% of the Company's revenues for the six months ending 6/30/00.  Defendants

26   boasted about the growth of Tut's sales to the multi-tenant industry but failed to disclose the design and

27   manufacturing problems with the Expresso System Platforms and the decision to recall *all* of the

28

1 Company's products. Defendants also failed to disclose that its largest customer, Trigem, would not buy

2 any product from Tut in 3Q00 and thus its revenue and earnings would not be growing as they had forecast.

3       9.    The Company's stock price continued to rise in 7/00 and 8/00 reaching a Class Period high

4 of $120.375 on 8/29/00. Defendants, taking advantage of the Company's inflated stock price, sold

5 188,100 shares, or 46.5% of their total available holdings for illegal insider trading proceeds of more than

6 $17 million. With full knowledge of the undisclosed product problems, recall, the loss of the Company's

7 largest customer (Trigem) and the concealed sham transaction with Reflex, each of the individual defendants

8 suddenly sold their shares in unison during a narrow three week period from 8/1/00-8/24/00, with several

9 of the individual defendants selling their shares on the same day. As shown below, defendants' 8/00 sales

10 were at prices between $83.13 and $104.3, – virtually the highest prices in all of 2000 – and far in excess

11 of the $5.8438 price at which Tut stock traded at the end of the Class Period.

12



**Tut Systems, Inc.**
December 31, 1999 - June 29, 2001
Daily Share Prices

26       10.    In 9/00 and 10/00, the price of Tut's stock declined closing at $51.875 on 10/17/00.

27 Several analysts reported the decline was due to concerns about financing issues related to competitive

28 local exchange carriers ("CLECs") and building local exchange carriers ("BLECs"), many of whom had

1   recently issued earnings warnings and disclosed financing problems. Nevertheless, analysts predicted that

2   Tut would report impressive 3Q00 financial results. Defendants knew of this problem firsthand as

3   numerous customers including Darwin, CAIS Internet, Rycom and Reflex were all delinquent in paying Tut.

4        11.   On 10/18/00, defendants caused Tut to report record revenues and earnings for 3Q00 that

5   exceeded analyst expectations. Despite these positive false statements, the price of Tut's stock declined

6   further to $36.875 on 10/18/00 and to $27.75 on 10/19/00. Analysts and the financial press attributed

7   the decline to the announcement by one of Tut's competitors, Copper Mountain Networks, Inc., that it

8   expected 4Q00 financial results to decline.

9        12.   In 11/00 and 1/01 even though they continued to withhold material information about their

10   product defects and recall, Tut began to condition the market for the inevitable decline in its stock price.

11   At that time, Tut substantially reduced revenue guidance for 4Q00 from $34.2 million to $6-$7 million

12   telling the market (falsely) that this 80% reduction was the result of adverse developments in the

13   telecommunications industry that had affected Tut's service provider customers. As a result, Tut's stock

14   price dropped to below $10 per share but still traded at artificially inflated levels due to the improper

15   revenue recognition and failure to reserve for uncollectible receivables, and excess and obsolete inventory.

16   ***Indeed, despite the record financial results reported for 2Q00 and 3Q00, Tut reported increasing***

17   ***and deteriorating levels of receivables and inventories***.

18        13.   On 1/31/01 Tut reported horrible financial results and massive write-offs of uncollectible

19   receivables and worthless inventories - finally accounting for the problems that had begun in the summer

20   of 2000. Tut reported 4Q00 revenues of less than $6 million and a staggering loss of $68 million or

21   ($4.12) EPS. The bad debt reserve which was approximately $500,000 during the Class Period was

22   increased to $21.2 million – a 3800% increase. Tut wrote off more than $1 million of inventory and the

23   Company's reserve for obsolete and excess inventory increased from approximately $1.9 million at 9/30/00

24   to $13.8 million at 12/31/00 - a 600% increase. Tut also incurred a $19 million charge for cancelled

25   purchase orders and a $3.1 million charge to write-off the Company's equity investment in three customers

26   (including Reflex and Darwin). This announcement caused the Company's stock price to fall to as low as

27   $5.84, causing hundreds of million of dollars in damages to members of the class.

28

14.   Since the end of the Class Period, the problems at Tut have only gotten worse.  In the three quarters since the end of the Class Period, Tut has reported declining sales, massive additional write-offs of excess and obsolete inventories and huge losses.  The inventory reserve was increased by more than $33 million and Tut reported a net loss of $104.3 million or ($6.39) EPS for the year ending 12/31/01.  The Company's stock price has not recovered and currently trades at prices less than $2 per share.

### JURISDICTION AND VENUE

15.   The claims asserted herein arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5.  Jurisdiction is conferred by §27 of the 1934 Act, 15 U.S.C. §78aa.

16.   Venue is proper here pursuant to §27 of the 1934 Act.  The acts and transactions giving rise to the violations of law complained of occurred here.

### THE PARTIES

17.   Lead plaintiffs are Mark Krist and Robin O. Avery.  Each of these class members purchased Tut securities at artificially inflated prices during the Class Period and were damaged thereby.

18.   Defendant Tut designs, develops and sells advanced communications products that enable service providers to deliver over existing copper telephone lines high-speed data access to multi tenant buildings.  Tut maintains its headquarters at Pleasanton, California.  During the Class Period, Tut's securities traded in an efficient market on the NASDAQ National Market System.  Tut owned stock in Darwin and Reflex, two of its largest customers in 2000.  Tut improperly recognized more than $16 million of revenues on contingent sales to Darwin and Reflex in 2000.  Tut incurred losses of at least $12 million on these sales because Darwin and Reflex failed to pay Tut more than $12 million and eventually declared bankruptcy.  Tut also lost more than $3.1 million on its equity investments in three customers including Reflex and Darwin due to the bankruptcies of the two companies.

19.   (a)   Defendant Salvatore D'Auria ("D'Auria") was, during the Class Period, Chairman, President and Chief Executive Officer of the Company.  Per the Company's Bylaws, all corporate powers were to be exercised under the authority of the Board of Directors of which D'Auria was Chairman.  The Bylaws also required the Board of Directors to conduct, manage and control the business affairs of the Company.  As Chairman, D'Auria presided at all Board of Director meetings.  Under the Company's

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS- C-01-2659-CW

- 6 -

1   Bylaws, D'Auria, as President and CEO, had general supervision, direction and control of the business,

2   other officers and employees of Tut.  In 2000 D'Auria received a salary of $249,519 and a bonus of

3   $140,625.  Between 8/1/00-8/22/00, D'Auria sold 55,100 shares of Tut stock for insider trading proceeds

4   of $5.2 million.  D'Auria was also a shareholder of Darwin, one of Tut's largest customers.

5         (b)  Defendant Nelson Caldwell ("Caldwell") was, during the Class Period, Vice

6   President of Finance and Chief Financial Officer of the Company.  Per the Company's Bylaws, the CFO

7   was required to keep and maintain adequate and correct accounts of the properties and business

8   transactions of the Company, including accounts of its assets, liabilities, receipts, disbursements, gains,

9   losses, capital, surplus and shares.  As CFO Caldwell signed Tut's 2Q00 and 3Q00 Form 10-Qs filed with

10  the Securities and Exchange Commission ("SEC").  In 2000 Caldwell received a salary of $171,923 and

11  a bonus of $70,500.  Between 8/1/00-8/18/00, Caldwell sold 19,200 shares of Tut stock for insider

12  trading proceeds of $1.78 million.  Caldwell was also a shareholder of Darwin.  Caldwell resigned from

13  Tut in 8/01.

14        (c)  Defendant Allen Purdy ("Purdy") was, during the Class Period, Vice President-

15  Sales of the Company until his resignation on 9/30/00.  In 2000 Purdy received a salary of $41,033, a

16  bonus of $38,625 and $104,351 pursuant to separation agreement.  Between 8/3/00-8/24/00, Purdy sold

17  8,800 shares of Tut stock for insider trading proceeds of $779,055.

18        (d)  Defendant Sanford Benett ("Benett") was, during the Class Period, Chief Operating

19  Officer of the Company until his resignation on 11/30/00.  In 2000, Benett received a salary of $124,216,

20  a bonus of $65,013 and $215,799 pursuant to a 10/30/00 employment agreement.  On 8/4/00, Benett sold

21  5,000 shares of Tut stock for insider trading proceeds of $415,890.

22        (e)  Defendant Matthew Taylor ("Taylor") was Founder, Chief Technology Officer and

23  Director during the Class Period until his resignation from all positions at the Company effective 1/19/01.

24  In 2000, Taylor received a salary of $150,000 and a bonus of $35,625.  Between 8/1/00-8/17/00, Taylor

25  sold 100,000 shares of Tut stock for insider trading proceeds of $8.9 million.

26        20.  The defendants referred to in ¶¶19(a)-(e) are referred to as the "Individual Defendants."

27  Because of their senior executive and managerial positions with Tut, the Individual Defendants had access

28  to the adverse undisclosed information described herein regarding the Company's business operations,

1   financial condition, products, markets, customer relationships, and present and future business prospects

2   and product demand.  In fact, the running of the business, the maintenance of its financial health and success

3   of the mergers and acquisitions were the principal responsibilities of the Individual Defendants.  The

4   Individual Defendants knew or recklessly disregarded that said adverse undisclosed information had not

5   been disclosed to, and was being concealed from, the investing public.

6       21.    Because they were responsible for running the Company, it is appropriate to treat the

7   Individual Defendants as a group for pleading purposes and to presume that the false, misleading and

8   incomplete information contained in the Company's public filings, press releases and other publications as

9   alleged herein are their collective actions.  Each of the Individual Defendants was directly involved in the

10  day-to-day operations of the Company at the highest levels, was privy to confidential proprietary

11  information concerning the Company and its business, operations, products, growth, financial statements,

12  and financial condition, as alleged herein.  Said defendants knew of the product problems and recall and

13  were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements

14  and information alleged herein, were aware of or deliberately disregarded that the false and misleading

15  statements were being issued regarding the Company, and approved or ratified these statements, in

16  violation of the federal securities laws.

17      22.    As officers, directors and controlling persons of a publicly held company whose securities

18  was, and is, registered with the SEC pursuant to the 1934 Act, traded on the NASDAQ, and governed

19  by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate

20  promptly accurate and truthful information with respect to the Company's financial condition and

21  performance, growth, operations, financial statements, business, products, markets, management, earnings

22  and present and future business prospects, and to correct any previously issued statements that had become

23  materially misleading or untrue, so that the market  price of the Company's securities would be based upon

24  truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the

25  Class Period violated these specific requirements and obligations.

26      23.    Each of the defendants is liable as a direct participant in, and a co-conspirator with respect

27  to the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their positions,

28  are "controlling persons" within the meaning of §20 of the 1934 Act and had the power and influence to

1    cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of

2    control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of the

3    Company's business.

4         24.     The Individual Defendants, because of their positions with the Company, controlled and/or

5    possessed the authority to control the contents of its reports, press releases and presentations to securities

6    analysts and through them, to the investing public.  The Individual Defendants were provided with copies

7    of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their

8    issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus,

9    each of the defendants had the opportunity to commit the fraudulent acts alleged herein.

10                        **SUBSTANTIVE ALLEGATIONS**

11   **A.     Description of the Company and Its Products**

12        25.     Tut was incorporated in 1983 and began operations in 1991.  From 1991 through most

13   of 1998, substantially all of Tut's revenue was derived from the sale of XL Ethernet LAN extension

14   products to the corporate and university segments of the multi-tenant commercial unit ("MCU") market.

15   In early 1997, Tut introduced the first products in the Expresso product line for the Internet service

16   provider markets and in early 1998, began licensing its HomeRun technology to semiconductor, computer

17   hardware and consumer electronics manufacturers for incorporation into integrated circuits and consumer

18   products, including PCs, peripherals, modems and other Internet appliances.  In the second half of 1998,

19   Tut commenced selling the Expresso GS products, which were configured for local loop applications, and

20   Expresso multi-dwelling unit ("MDU") products, which incorporated Tut's HomeRun technology to a

21   broader range of service providers, primarily those serving apartment complexes, hotels, university

22   dormitories and military complexes in the MDU market.

23        26.     According to the Company's SEC filings and website, Expresso MDU and Expresso GS

24   products consist of a compact, modular central-site shelf or chassis containing a management card, ethernet

25   MUX card, T-1 WAN Router card, ethernet switch card, and up to 17 xDSL, HomeRun or LongRun line

26   cards.  Those products enable multi-unit buildings to provide Internet access to their occupants over

27   existing copper telephone wires.

28

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL
SECURITIES LAWS- C-01-2659-CW                                                              - 9 -

27.     Tut went public in 1/99 at $18 per share, selling 2.875 million shares (including the overallotment) for proceeds of $46 million. It was a "hot" IPO and Tut's stock traded between $20 and $50 during most of 1999. In early 1999, Tut began selling Expresso MDU products incorporating LongRun technology and Expresso MDU Lite into additional segments of the MDU market. In late 1999, Tut began selling its Expresso SMS 2000 and companion Expresso OCS system providing subscriber management, bandwidth management, credit card billing and other functions to the MDU market, and in early 2000, Tut began selling its OneGate Internet server appliances, acquired as a result of its acquisition of FreeGate Corporation, to the MCU market.

28.     In 2/00, Tut had acquired FreeGate Corporation for $25 million, mostly in Tut stock, and in 5/00 Tut acquired Xstreamis for $19 million in stock. Tut was attempting to integrate these and other acquisitions as the Class Period began.

29.     In 3/00, Tut completed a secondary offering, selling 2.5 million shares at $60 per share for net proceeds of approximately $141.7 million. Tut's stock declined from the $60+ range to the mid $20's in the spring of 2000 with the general tech stock decline but began to recover as summer 2000 began.

30.     Following the Company's IPO in 1/99 and its secondary offering in 3/00, several analysts including those from the investment banks that underwrote the IPO, initiated coverage of Tut and issued reports based on and repeating information provided to them by defendants. Prior to the Class Period Tut reported revenues that met or exceeded targets reported by these analysts. For example, on 1/19/00 Tut reported 4Q99 revenues of $10.6 million and ($0.35) EPS, and FY99 revenues of $27.8 million and ($1.12) EPS which exceeded estimates by Lehman Brothers analyst, Steven D. Levy and Kaufman Bros. analyst, Clifton Gray.

31.     On 4/19/00 Tut reported 1Q00 revenues of $16.5 million and ($0.22) EPS. On 4/19/00 Kaufman Bros. analyst Clifton Gray and Lehman Brothers analyst Steven D. Levy each reported that Tut's 1Q00 revenues and EPS were well above their projections. Clifton had projected 1Q00 revenues of $11.6 million and ($0.24) EPS. Levy had projected 1Q00 revenues of $11.5 million and ($0.30) EPS. Clifton also reported the ($0.22) EPS exceeded the consensus First Call estimate of ($0.28) EPS. Clifton and Levy each increased their revenue and EPS projections for the remainder of 2000 based on these reported results and based on guidance provided by the Company. Each reiterated their "strong buy" and "buy"

ratings on the stock.  Clifton recommended that investors buy the stock aggressively at its current $41 price and predicted the stock price would increase to as high as $100.

**B.     Tut's Revenue Was Dependent on Sales of Its Expresso Products to a Small Number of Customers**

32.     According to the Company's SEC filings Tut generated revenue primarily from the sale of products and, to a lesser extent, from technology licenses.  Product revenues comprised 94.5% and 97.2% of total revenues in 1999 and 2000.  The Company represented in its SEC filings that it recognized product revenue in accordance with Generally Accepted Accounting Principles ("GAAP"), *i.e.*, when (1) persuasive evidence of an arrangement existed, (2) delivery had occurred, (3) the fee was fixed and determinable, and (4) collectibility was probable.  The Company also represented in its SEC filings that inventories were reported at the lower of cost or market.  Tut reported increasing quarterly revenues in 1999 and throughout the Class Period.

33.     A majority of Tut's sales in 1999 and 2000 came from a small number of customers. Tut's ten largest customers accounted for 62% of net sales in 1999 and 72.2% of net sales in 2000. In 1999, CAIS, Inc. and Rycom CCI, Inc. ("Rycom") accounted for 12% and 11% of net sales.  In 2000, Trigem Infocom, Inc. ("Trigem"), Reflex Communications, Inc. ("Reflex") and Darwin Networks, Inc. ("Darwin") accounted for 18%, 12% and 11% of net sales.  Other large customers included I-Quest, Velocity HSI, Inc., and Ardent, Inc. (dba CAIS, Inc. and CAIS Internet).  The Company's ability to report increasing quarterly revenues was dependant on continued sales to these customers.

34.     Thus, throughout 2000 and at the beginning of the Class Period, defendants led the market to believe that Tut would continually meet or beat estimates and knew that the market expected Tut to report increasing revenues and EPS during 2000.  They also knew that because the Company was dependent on a small number of customers for a majority of its sales, any decline in sales to those customers would materially and adversely impact Tut's revenue.

35.     As set out below, by the summer 2000 defendants knew that Tut's primary product offering, the Expresso System Platform, contained significant design and manufacturing defects that caused the product to overheat and fail, and which led to a recall of *all* Expresso System Platforms.  Additionally, by July, defendants learned that Trigem, Tut's largest customer in the first half of 2000, would no longer be

1   purchasing Tut's product.  Defendants also knew customers Darwin, CAIS, Rycom and Reflex were

2   delinquent.  Thus, by at least the beginning of 3Q00, defendants knew that Tut could not meet, let alone

3   exceed, the revenue and earnings that they had led the market to expect.

4          36.     Tut was only able to report increasing quarterly revenues and EPS during the Class Period

5   by (1) improperly recognizing revenues on sales of defective product, (2) improperly recognizing revenues

6   on contingent sales to the Company's large customers, including sham sales to Reflex, by then a related

7   party, (3) failing to adequately reserve for the Company's increasing and deteriorating level of receivables,

8   and (4) failing to adequately reserve for excess and obsolete inventory.

9                              **DEFENDANTS' SCHEME TO DEFRAUD**

10  **A.     Defendants Caused Tut to Improperly Recognize Revenues on Sales in 2Q00 and 3Q00
        of Products that They Knew Were Defective**

11         37.     As set forth in the Company's SEC filings, Tut's principal product offering was the Expresso

12  System Platform.  The Expresso System Platform product line included Expresso MDU, Expresso MDU

13  Lite, Expresso GS and Expresso SMS 2000.  Expresso MDU and Expresso GS products consisted of a

14  compact, modular central-site shelf (or chassis) that contained various components including a management

15  card, interface cards and multiple HomeRun or LongRun line cards.  Each of these product offerings

16  integrated the Company's FastCopper technology and were designed to provide high-speed data access

17  to multi-tenant buildings over existing copper telephone wires.

18         38.     According to CW1, a former Director of Customer Service,  and CW3, a former Customer

19  Service Manager, throughout 2000, many of Tut's Expresso System Platforms did not work and the

20  Company did not have a strong engineering staff to make them work.  Indeed, CW1 stated that many of

21  the products CW1 tested prior to shipment were deplorable.  CW1 and CW3 stated that customers

22  constantly returned defective products to Tut prior to and during the Class Period including Trigem, Tut's

23  largest customer in 2000.  By the summer of 2000 Tut had determined that the problems with the product

24  involved both design and manufacturing defects.  CW1, CW2, CW3 and CW4 stated that Tut instituted a

25  major recall of these defective products in the summer of 2000.

26         39.     The primary problem with the Expresso System Platforms were defects in the HomeRun

27  and LongRun line cards – the heart of Tut's products – that caused the Platforms to overheat and catch fire.

28

1   CW1 and CW3 stated that the cards caught fire due to contamination problems.  CW2 and CW4 also

2   stated customers returned product because they were overheating and catching fire.  As disclosed in the

3   Company's 2000 Form 10-K, Tut did not manufacture any of its own products.  Rather, Tut relied on

4   contract manufacturers to assemble, test and package the Company's products.  CW1 stated that Tut relied

5   on one company to manufacture the cards, Dovatron, and hired Xerox and NCR to install the cards.  CW1

6   and CW3 stated that some of the cards NCR was installing (including a card installed at the Hilton Hotel

7   in St. Louis) caught fire because of contamination problems.  CW1 stated that Expresso Systems delivered

8   to customers of I-Quest and Darwin also overheated and caught fire.  Specifically, CW1 stated that

9   something between the glue and the solder and AC converter was contaminated which caused the card to

10  get hot and the glue to act as a catalyst (the manufacturing problem).  By the summer of 2000, CW1 brought

11  this problem to the attention of senior management, including all of the Individual Defendants, but Tut

12  continued to ship the defective boards.  According to CW1 Tut continued to use Dovatron after the problem

13  was discovered.  Although Tut began to spot check the product before shipment, CW1 said defective

14  product continued to be shipped because Tut was not testing the product in the same environment that Tut's

15  products were operating in at customer sites.

16        40.   Generally, Tut's Expresso Systems were installed in a closet in the basement of the multi-

17  tenant building.  CW1 said that initially the spot check Tut performed was simply running electricity through

18  the cards in an open chassis.  The chassis were not enclosed and did not replicate the environment Tut's

19  products were operating in at customer sites.  CW1 stated that Tut's customer service department along with

20  Quality Assurance and Operations subsequently replicated the "flameout" problem in the lab by placing a

21  box over the MDU chassis to simulate the environment the Expresso Systems were operating in.  CW1

22  stated that the cards flamed during these replication tests.

23        41.   CW1 also stated that the problem was not just a manufacturing defect but a design defect.

24  Specifically, CW1 stated that the cards, and the components that were part of the cards, were not designed

25  to withstand temperatures the cards were exposed to in the chassis at customer sites.  CW1 stated that the

26  HomeRun and LongRun line cards were the cards that overheated and caught fire because they transmitted

27  most of the traffic.

28

1    42.    CW1 stated the recall was instituted prior to 8/00.  CW3 stated that D'Auria, Caldwell,

2  Benett, Purdy and others made the decision to recall the product and that Caldwell sent CW3 an email

3  directing CW3 to begin retrieving product.  The recall was not publicly disclosed.  CW1 stated that during

4  the recall some customers sent back the entire chassis and others sent back the defective cards.  In addition,

5  Tut sent engineers to customer sites to replace defective cards with new cards.  CW3 stated that thousands

6  of cards were returned to Tut and placed in warehouses located in Pleasanton and Walnut Creek.  CW1

7  stated that as soon as Tut instituted the recall, Tut's receiving bay was filled with returned product.  CW1

8  stated that every day Tut would receive approximately 10 boxes of returned product each containing

9  approximately 2-3 chassis.  CW1 stated that on several occasions the volume of returns was so high that

10  employees could not physically get into the shipping/receiving area because it was filled with the recalled

11  product.

12    43.    CW1 stated that Tut staggered notifying customers about the recall because Tut did not have

13  enough new product to replace all of the defective cards.  CW3 said sales and customer support were

14  fighting over new product.  Sales wanted the new product to ship and generate new sales.  Customer

15  support needed the product to replace the defective product for existing customers.  CW1 stated that

16  initially, CAIS Internet, Darwin and I-Quest were the first to receive replacements for defective product

17  because they were triple stacking chassis and the first customers to experience the overheating problems.

18  CW3 also stated that Darwin and CAIS Internet received replacements for defective product.  According

19  to Tut's 1Q00 Form 10-Q, I-Quest was Tut's second largest customer generating 17% or $2.8 million of

20  Tut's 1Q00 revenues.  According to Tut's 2Q00 Form 10-Q, Darwin and I-Quest were Tut's second and

21  third largest customers generating revenues of $5.2 million and $3.7 million in the six months ending 6/30/00.

22    44.    CW1 stated that Tut's upper management knew the product problems were rampant.  CW3

23  said everyone in the Company knew about the problem.  CW2 and CW4 knew about the cards catching

24  fire.  Indeed, given that Tut was essentially a one-product company (with different variations), and all of the

25  product was recalled, it was impossible *not* to know about the product defects.  For example, when CW4

26  was first asked about Tut's products the witness said, you mean the ones that kept catching fire?  Further,

27  CW1 also stated that the product problems were discussed at weekly staff meetings attended by defendants

28  D'Auria, Caldwell, Benett, and other Tut executives including Marilyn Lobel (Tut's Controller during the

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL
SECURITIES LAWS- C-01-2659-CW                                                                          - 14 -

1  Class Period and its current CFO), Mark Carpenter (Tut's Vice President of Marketing during the Class

2  Period), Thomas Warner (Tut's Vice President of Engineering during the Class Period who reported to

3  Taylor) and Avi Caspi (Tut's Vice President of Operations during the Class Period).  CW1 stated that

4  Warner told CW1 that Taylor knew of the product problems.  CW1 also stated that during the recall there

5  were often 2-3 meetings per day.  CW1 said that D'Auria and Caldwell also participated in conference calls

6  with CAIS Internet and Darwin to update those companies on the status of replacing the defective product.

7  CW1 also stated that D'Auria held defendant Benett responsible for the product problems.  Benett resigned

8  from Tut effective 11/30/00.

9       45.    CW1 stated that another problem was that Tut's ethernet boards were supposed to, but did

10  not, have a collision detection feature which allowed a modem to determine whether there was any traffic

11  on the lines before e-mails were sent.  This situation created huge problems for Tut's customers.  CW1

12  stated that the ethernet boards did not work for customers because the e-mails were colliding with each

13  other and the computer.  The computer would attempt again and again to send the e-mails further clogging

14  the lines due to the lack of the collision detection feature.

15       46.    Defendants caused Tut to improperly recognize revenues on sales of defective products in

16  violation of GAAP and the Company's publicly reported revenue recognition policy and falsely represented

17  that revenue to the market.  ¶¶101-112.  Both GAAP and Tut's revenue recognition policy did not permit

18  revenue recognition upon shipment unless, among other things, collectibility was probable.  Collectibility was

19  not probable due to the product defects. *See* AICPA Statement of Postion ("SOP") 97-2.

20       47.    Further, Financial Accounting Standards Board ("FASB") Statement of Financial Accounting

21  Concepts ("FasCon") No. 5 states that revenues are not to be recognized until earned.  FasCon No. 5 at

22  ¶83(b).  Revenues are earned when the entity has substantially accomplished what it must do to be entitled

23  to the benefits represented by the revenues. *Id.* If collectibility is doubtful, revenues may only be recognized

24  when cash is received.  ¶84(g).  Tut had not substantially accomplished what was required (*i.e.*, shipping

25  nondefective product) for it to recognize the revenues.

26  **B.**    **Defendants Caused Tut to Improperly Recognize Revenues on Contingent Sales to Its**
       **Largest Customers and Sales to Reflex, an Undisclosed Related Party**

27

28

1.      **Contingent Sales**

48.      According to Tut's SEC filings, Trigem, Reflex and Darwin accounted for 41% of Tut's sales in 2000.  Trigem, a Korean distributor, accounted for $12.9 million or 18% of Tut's 2000 revenues.  A majority of these revenues - $12.4 million - were recognized by Tut in 1Q00 ($5.9 million) and 2Q00 ($6.5 million).  Indeed, Trigem accounted for 33% of Tut's revenues for the six months ending 6/30/00.  Darwin accounted for $7.9 million or 11% of Tut's 2000 revenues.  Of that amount, $5.2 million was recognized by Tut in the first two quarters of 2000 and $2.7 million was recognized in 3Q00.  Darwin did not generate any revenues in 4Q00.  Tut, D'Auria and Caldwell were Darwin shareholders.  Reflex accounted for $8.6 million or 12% of Tut's 2000 revenues – all of it by 9/30/00.  According to documents filed by Tut in the Reflex bankruptcy, including Tut's Aged Receivables Report, the vast majority of these revenues – approximately $6.7 million – were recognized by Tut in 3Q00.

49.      Tut's sales to Darwin and Reflex were governed by Channel Partner Agreements ("CPA").  Copies of these agreements are attached to the Appendix and incorporated by reference.  The Darwin CPA had an effective date of 12/99 and was executed by defendant Taylor on 12/21/99.  The Reflex CPA had an effective date of 9/3/99 and was executed by defendant Caldwell.  Both CPAs required Darwin and Reflex to pay Tut within 30 days of acceptance.  Under the CPAs, Darwin and Reflex could not return product to Tut after the expiration of the rejection period (15 business days from the date of delivery) without Tut's prior written consent.

50.      According to CW1, Tut's largest customers, including Trigem, Darwin and Reflex, did not have to pay and did not pay Tut until they actually resold the product to their customers.  CW2 stated that defendant D'Auria extended payment terms to Darwin, Reflex and CAIS Internet and continued to ship these customers product even though they had not paid for previous purchases.  CW4 stated that defendant Caldwell automatically gave Tut's large customers like Darwin, Reflex, CAIS Internet and Rycom extended payment terms and directed CW4 to ship product to nonpaying customers.  Further, CW1 informed plaintiffs that Tut's largest customers also had the right to, and did, return product that they were unable to resell.  Under these circumstances, GAAP precluded Tut from recognizing revenues until its channel partners resold Tut's product and paid Tut. *See* SOP 97-2, FASB Statement of Financial Accounting Standard ("SFAS") No. 48, FasCon No. 5.

51.     Tut's SEC filings and documents filed in the Darwin and Reflex bankruptcies confirm Tut's customers did not pay their accounts as required by the CPAs.  Tut's SEC filings in 2000 disclosed a substantial increase and deterioration in the Company's receivables.  Receivables tripled from 1Q00 to 3Q00, increasing from $10.3 million at 3/31/00 to $15.4 million at 6/30/00 to $30.6 million at 9/30/00. Further, days sales outstandings ("DSOs") also deteriorated from 67 days at 6/30/00 to 97 days at 9/30/00. The increase in receivables and DSOs reflected customers failure to pay within 30 days of acceptance.

52.     According to Tut's SEC filings, Tut recognized revenue of $5.2 million in the first two quarters of 2000 and $2.7 million in 3Q00 on sales to Darwin.  All of the $7.9 million should have been paid to Tut within 30 days of acceptance in accordance with the Darwin CPA.  However, Tut's objection to the proposed sale of Darwin's assets filed with the bankruptcy court  reveals that Darwin did not pay Tut $5 million.  That unpaid $5 million does not include $1.5 million paid by Darwin to Tut on 11/14/00 that the Darwin Bankruptcy Trustee has sued Tut to return.  Tut's filing in the Darwin bankruptcy confirms Darwin did not pay Tut as required by the CPA.

## 2.     Related Party Sales to Reflex

53.     According to CW3 Trigem purchased Tut's MDU Lite product in the first half of 2000. CW3 stated that Trigem stopped purchasing product from Tut in 3Q00 because it was able to purchase a similar product for a lower price from a Korean company.  Thus at the beginning of 3Q00, at the same time that Tut was in the midst of dealing with major product design and manufacturing defects and a recall of all of its products, it lost 33% of its revenue.[1]  Defendants needed to obtain a revenue source if they had any hope of reporting the growth that they had led the market to expect.  They found the "revenue" in Reflex.

54.     According to Tut's 2000 Form 10-K filed on 4/2/01, Reflex accounted for $8.6 million or 12% of Tut's 2000 revenues – all of it by 9/30/00.  According to documents filed by Tut in the Reflex bankruptcy, including Tut's Aged Receivables Report, the vast majority of these revenues - approximately $6.7 million - were recognized by Tut in 3Q00.

55.     Under the Reflex CPA, Tut agreed to sell Reflex its products at substantial discount provided that Reflex purchased certain milestone amounts in specified quarters.  Thus, under the CPA Reflex

---

[1]     Tut's Form 10-Q for the period ending 9/30/00 disclosed that Trigem did not generate any revenue in 3Q00.

1  was obligated to purchase $600,000 in 4Q99, $900,000 in 1Q00, $1.2 million in 2Q00, $1.5 million in

2  3Q00 and $1.8 million in 4Q00 to be eligible for a 40% price discount.  According to documents filed by

3  Tut in the Reflex bankruptcy, including an "Aged Receivables Report," for the first half of 2000, Reflex

4  purchased approximately $1.9 million of Tut's products, a little less than the $2.1 million needed to be on

5  track under the terms of the CPA.

6         56.     On 7/12/00, Tut purchased 1.3 million shares of Reflex preferred stock in a  $33 million

7  private placement.  A copy of Tut's preferred stock certificate is attached to the Appendix and incorporated

8  by reference.  Over the next several days, Tut sent Reflex invoices totaling approximately $1.9 million –

9  equal to all the product Relfex had purchased from Tut in the entire first six months of 2000.  In 8/00, the

10  purchases doubled to $4.1 million and in 9/00 Tut invoiced Reflex an additional $650,000, for a quarterly

11  total of $6.7 million.  Thus, in 3Q00 Reflex "purchased" over four times the amount of product required

12  under the CPA for that quarter.

13         57.     In 7/00-8/00, CW1 asked a senior sales executive why Tut was shipping so much

14  equipment to Reflex when CW1 was sure they couldn't use all of it.  The executive's response was in

15  essence that because they (Tut) were shareholders in Reflex, they could do whatever they wanted.  CW1

16  also recalled a similar conversation with an employee in the sales process who commented that Reflex (and

17  Darwin) didn't have a choice in the matter, "If we tell them they have to take the merchandise, then they have

18  to take it."  According to CW4, Tut was shipping product to Reflex even though Reflex was not paying for

19  the shipments.

20         58.     Documents filed by Tut in the Reflex bankruptcy, including the "Aged Receivables Report"

21  reveal that Reflex did not pay Tut $7.07 million for product purchased in 2000.  The Aged Receivable

22  Report is an exhibit to defendant Caldwell's declaration filed in the Reflex bankruptcy and is attached to the

23  Appendix.  Tut's Aged Receivables Report and SEC filings reveal that approximately $6.7 million of the

24  $7.07 million was purchased by Reflex in 3Q00 - the quarter Trigem generated no sales for Tut.  Reflex did

25  not generate any revenues in 4Q00.  Reflex did not pay Tut for any of the product purchased in 3Q00 and

26  filed for bankruptcy protection shortly thereafter.

27         59.     According to a declaration filed by Edmund Wood, the Reflex Bankruptcy Trustee, much

28  of the product sold to Reflex was never sold to Reflex's customers, remained in its original packaging and

1   was warehoused by Reflex at various locations around the country including rental properties, storage

2   lockers, home garages of some Reflex managers and in leased vans.  A copy of this declaration is attached

3   to the Appendix.  Nevertheless, these "sales" allowed Tut to announce "triple digit" growth in 3Q00.

4   **C.    Throughout the Class Period Defendants Caused Tut to Materially Overstate Earnings by Not Reporting Inventory at the Lower of Cost or Market**

5
6   60.    Tut falsely represented in its SEC filings that it reported inventory in accordance with GAAP

7   at the lower of cost or market.  In fact, due to the product problems and returns, Tut failed to adequately

8   reserve for returned defective products and obsolete inventory.  Tut's CPAs included warranty terms that

9   required Tut to repair or replace defective product.  According to CW1 and CW3, if a customer

10  complained about product purchased from Tut, the customer could ship the product back to Tut and Tut

11  would replace the product free of charge, often with new or upgraded products.  CW1 and CW3 stated

12  that returned product was placed in warehouses by Tut.  Moreover, as set forth in ¶¶37-44, substantial

13  amounts of recalled defective Expresso Platform Systems were returned to Tut during the Class Period and

14  stored in Tut warehouses.  During the Class Period, Tut's gross inventory quadrupled from $12.8 million

15  at 3/31/00 to $50.0 million at 12/31/00.  However, even though defendants knew that Tut's products were

16  defective and therefore worthless, Tut did not reserve for its defective, obsolete and excess inventory until

17  after the Class Period.  Despite the huge increase in inventory and the recall of defective product, during the

18  Class Period, Tut only increased its reserve from $1.2 million at 3/31/00 to $1.9 million at 9/30/00.  Then,

19  in 4Q00, Tut increased its provision for obsolete and excess inventory by $13 million and wrote off an

20  additional $1.1 million.

|             | 3/31/00   | 6/30/00   | 9/30/00   | 12/31/00  |
|-------------|-----------|-----------|-----------|-----------|
| Gross Inv.  | $12,842   | $16,861   | $24,160   | $50,040   |
| Provisions  | 732       | 358       | 385       | 12,993    |
| Write-offs  | 0         | 0         | 0         | (1,131)   |
| Reserves    | 1,150[2]  | 1,508     | 1,893     | 13,755    |
| Net Inv.    | 11,692    | 15,353    | 22,267    | 36,285    |

---

[2]     The beginning balance of the reserve for excess and obsolete inventory at 12/31/99 was $418,000.

61.     However, even the massive increase in the reserve for obsolete and excess inventory incurred by Tut in 4Q00 was insufficient to report Tut's inventory in accordance with GAAP at the lower of cost or market.  In the first three quarters of 2001 Tut has incurred an additional $33.3 million in charges to reserve for excess and obsolete inventory.  Thus, in the eight months since the end of the Class Period, Tut incurred more than $48 million in charges to reserve for obsolete, defective and excess inventory.

**D.     Defendants Caused Tut to Materially Overstate Earnings by Not Adequately Reserving for Uncollectible Accounts Receivable**

62.     Defendants knew Tut's earnings were materially overstated due to the failure to reserve for uncollectible receivables.  In addition to the improper revenue recognition described in ¶¶37-59, defendants knew Tut's customers were not paying.

63.     According to CW4, in 9/00 product shipments to Darwin and CAIS Internet were placed "on hold" because they had not paid Tut.  CW4 also stated that Reflex was shipped product in 3Q00 even though they were not paying Tut.  CW4 also stated that defendant Caldwell directed CW4 to ship product to Rycom in 12/00 despite Rycom's $700,000 account being past due.  Defendants also knew about customer delinquencies from Tut's Aged Receivables Report.  For example, the Aged Receivables Report for Reflex disclosed that Reflex had not paid Tut for any of the $6.7 million of product shipped in 3Q00 and that Reflex owed Tut a total of $7.07 million.

64.     As detailed in ¶¶51 and 106, Tut's receivables increased and deteriorated throughout the Class Period.  Receivables tripled from $10.4 million at 3/31/00 to $30.6 million at 9/30/00.  DSOs increased from 67 days at 6/30/00 to 97 days at 9/30/00.

65.     Despite the improper revenue recognition, customers' failure to pay and the corresponding increase and deterioration in Tut's receivables, the Company's bad debt reserve was only $335,000 at 3/31/00, $537,000 at 6/30/00 and $543,000 at 9/30/00.  Tut failed to adequately reserve for the Company's uncollectible receivables until after the Class Period when it increased the bad debt reserve by 3600% to $21.2 million and wrote off an additional $1.7 million of receivables.

# FALSE AND MISLEADING STATEMENTS
## DURING THE Class Period

A.   **Defendants' False and Misleading Statements Regarding Tut's 2Q00 Financial Results**

66.   <u>False Statement</u>: On 7/19/00, Tut announced its 2Q00 results in a press release which stated:

Tut Systems, Inc. More Than Quadruples Revenues ...

Tut Systems, Inc. today reported a strong second quarter performance with ***revenues for the quarter ended June 30, 2000, of $21 million***, an increase of 319%, compared to revenues of $5 million for the quarter ended June 30, 1999.  This quarter ***Tut achieved its first quarter of operating profitability on a pro forma basis*** – a quarter ahead of internal expectations.

***The net income for the quarter*** ended June 30, 2000, excluding certain noncash purchase acquisition expenses of $1.8 million, ***was $0.6 million, or $.04 per share***, compared with a net loss for the quarter ended June 30, 1999, of $(2.7) million or $(.23) per share.  Net loss for the quarter ended June 30, 2000, including noncash purchase acquisition expenses, was $(1.2) million.

"This is an exciting milestone for Tut to achieve pro forma profitability this rapidly in the fiscal year," said Tut Systems, Inc.  President and Chief Executive Officer, Sal D'Auria.  "Additionally, we beat our internal goals for every single financial metric including a two point increase in our gross margins.  ***Clearly, these kind of results show our business is accelerating beyond our expectations with a clear path for continued growth in future quarters***."

"***In the MTU market place, Tut also expanded its leadership position with total shipments to date of more than 17,000 building systems and over 200,000 lines to the multi-tenant industry,*** " said D'Auria.  "And, the exciting thing about this industry, is that systems deployments to commercial and residential multi-tenant buildings throughout the world are just beginning to be rolled out.  Our internal calculations show that only 1-2% of MTUs have building systems in them today – which indicates an enormous opportunity for Tut to continue to sell our multi-tenant solutions all over the world."

The Company's financial results reported in the 7/19/00 press release were repeated to the market in analyst reports issued on 7/20/00 by Kaufman Bros. analyst Clifton Gray, Oscar Gruss & Son, Inc. analyst Ayelet Oron and Frost Securities analyst Syed E. Haider (copies of which are attached to the Appendix and incorporated by reference).  Each analyst also reiterated their recommendations on the Company's stock and Gray increased the target price of Tut's stock to $145 from $100 per share.

67.   <u>Reasons Why and Defendants' Knowledge that Their Statements Were False and Misleading</u>: The financial results and other positive statements contained in the 7/19/00 press release and the 7/20/00 analyst reports were materially false and misleading for the reasons set forth in ¶¶37-65.

1   Defendants knew they were misleading the analysts into serving as conduits for distributing false information

2   to investors.

3           (a)      As detailed in ¶¶37-65, defendants knew the revenue and EPS numbers reported

4   for 2Q00 and the six months ending 6/30/00 were materially overstated because Tut (1) improperly

5   recognized revenues on sales of defective products, (2) improperly recognized revenues on contingent sales,

6   (3) failed to establish adequate reserves for obsolete and excess inventory and (4) failed to establish

7   adequate reserves for uncollectible accounts receivables.

8           (b)      As detailed in ¶¶37-59, Tut improperly recognized revenues on sales of defective

9   product that was subject to a major recall and improperly recognized revenues on sales to its largest

10  customers that were not required to pay Tut until they had resold the product.

11          (c)      D'Auria's representation that Tut's business was "accelerating beyond our

12  expectations with a clear path for continued growth in future quarters" was false and misleading because of

13  the product problems that required a major recall of Expresso System Platforms.  Further, Trigem, Tut's

14  largest customer in 1Q00 and 2Q00, would not be purchasing any product from Tut in 3Q00.  Defendants

15  knew this because Trigem and Tut's other customers provided rolling forecasts to the Company.

16          (d)      As detailed in ¶¶53-59, in response to the loss of Trigem, defendants began shipping

17  millions of dollars of product to Reflex in 7/00, 8/00 and 9/00 that Reflex never paid for.  After Tut

18  purchased 1.3 million shares of Reflex's preferred stock in 7/00, Reflex was suddenly shipped approximately

19  $7 million of product in 3Q00.  Although the Reflex CPA required payment within 30 days of acceptance,

20  plaintiffs have been informed by CW1, CW2 and CW3 that, in fact, Reflex (and Tut's other large customers)

21  were not required to pay until they resold Tut's product.  CW4 stated that Reflex was shipped product even

22  though they were not paying Tut.  Documents filed in the Reflex bankruptcy confirm Reflex did not pay for

23  *any* of the $6.7 million of product shipped to them in 3Q00 and that much of the product was never used

24  and remained in its original packaging.

25          (e)      As detailed in ¶¶62-65, Tut's failure to adequately reserve for uncollectible

26  receivables was reflected by the increase and deterioration of receivables.  Receivables increased from

27  $11.7 million at 3/31/00 to $15.4 million at 6/30/00.  DSOs increased to 67 days in the same time period.

28  However, the bad debt reserve was only increased by $202,000.  As shown by Tut's SEC filings and

1  documents filed by Tut in Darwin's bankruptcy, Darwin was not paying Tut within 30 days for the $5.2

2  million of product purchased in 1Q00 and 2Q00.  Despite the foregoing, Tut shipped another $2.7 million

3  of product to Darwin in 3Q00.  After the Class Period, Tut incurred more than $20 million in charges to

4  increase the bad debt reserve to $21.2 million as of 12/31/00.

5           (f)       In addition to the product problems and recall detailed in ¶¶37-47, Tut's failure to

6  adequately reserve for obsolete, defective and excess inventory was reflected by the increase in net

7  inventory from $10.4 million at 3/31/00 to $15.4 million as of 6/30/00.  Despite the product problems, recall

8  and corresponding increase in inventory, Tut incurred a $1.1 million expense in the first six months of 2000

9  ($732,000 in 1Q00 and $358,000 in 2Q00) to increase its inventory reserve from $418,000 at 12/31/99

10 to $1.5 million at 6/30/00.  After the Class Period, Tut incurred more than $48 million in charges to reserve

11 for obsolete, defective and excess inventory.

12           68.       False Statement: On 7/27/00, Tut filed its 2Q00 Form 10-Q with the SEC.  The Form 10-Q

13 was signed by defendant Caldwell and repeated the financial results contained in the 7/19/00 press release.

14 It was represented in the Form 10-Q that the financial statements contained therein reflected all adjustments

15 necessary to present fairly the Company's financial position, results of operations and cash flows as of and

16 for the three and six months ending 6/30/00 and 6/30/99.  The Form 10-Q also included the following

17 representations:

18     Manufacturing or design defects in our products *could* harm our reputation and business.

19           Any defect or deficiency in our products *could* reduce the functionality,
20     effectiveness or marketability of our products.  While we consistently attempt to improve
       our design, development, and manufacturing processes to eliminate or reduce the possibility
21     of potential defects, from time to time, we discover product defects from either design or
       manufacturing quality perspective.  ***To date, we have not experienced any significant***
22     ***loss from such defects nor do we believe that defects discovered during this or***
       ***previous quarters could cause orders for our products to be canceled or delayed,***
23     ***reduce revenue, or render our product designs obsolete***.  In that event, we would be
       required to devote substantial financial and other resources for a significant period of time
24     in order to develop new product designs.  We cannot assure you that we would be
       successful in addressing any manufacturing or design defects in our products or in
25     developing new product designs in a timely manner, if at all.  Any of these events,
       individually or in the aggregate, *could* harm our business, financial condition and results of
26     operations.

                                     *     *     *

27     A majority of our sales comes from a small number of customers; *if* we lose any of these
       customers, our sales *could* decline significantly.

28

For the three and six months ended June 30, 2000, 53% and 92%, respectively, of net sales came from 10 customers. Although the customer mix varies from quarter to quarter, we are dependent upon continued revenue from our major customers. As a result, *any material delay, cancellation or reduction of orders from these major customers could cause our sales to decline* significantly. Some of these customers individually accounted for more than 10% of our net sales in the first half of 2000. *TriGem InfoComm., Corp., Darwin Networks and I-Quest Corporation accounted for 33%, 14%, and 10%, respectively, of our net sales in the first half of 2000.* There is no guarantee that we will be able to retain any of our major customers or any other accounts. In addition, our customers may materially reduce the levels of services ordered from us at any time. This could cause a significant decline in our net sales and we may not be able to reduce the accompanying expenses at the same time.

69. Reasons Why and Defendants' Knowledge that the Financial Results and Statements About Product Defects Contained in the Form 10-Q Filed with the SEC on 7/27/00 Were Materially False and Misleading: The financial results reported in the Form 10-Q were false and misleading for the reasons set forth in ¶67.

(a) Defendants knew the statement that manufacturing or design defects "could" harm Tut's business and that the Company did not "believe that defects discovered during this or previous quarters could cause orders for our products to be cancelled or delayed, reduce revenue or render our product designs obsolete," was false and misleading. All of the Individual Defendants attended weekly staff meeting where the product problems and recall were discussed. Tut had to stagger notifying its customers of the recall because it did not have enough product to replace the defective product. Sales and customer support were fighting over the new product. Thousands of Expresso System platforms were being returned increasing Tut's supply of defective, obsolete and excess inventory. In short, manufacturing and design defects *already had* harmed Tut's business.

(b) Defendants also knew the statement that sales "could" decline significantly "if" Tut lost any of its large customers cancelled or reduced orders was false and misleading because Trigem, the Company's largest customer, would not be purchasing any product in 3Q00. Further, Tut's other large customers (Darwin, I-Quest, CAIS Internet) were experiencing financial problems of their own and were delinquent in paying their accounts.

(c) Item 303 of SEC Regulation S-K, 17 C.F.R. 229.303(a)(3)(ii) required Tut to describe any known trends or uncertainties that the registrant reasonably expected would have material favorable or unfavorable impact on net sales or revenues or income from continuing operations.

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL
SECURITIES LAWS- C-01-2659-CW                                                                        - 24 -

1   Consequently, the product problems, recall, loss of Trigem and the delinquency of Tut's other customers

2   were required to be disclosed.

3          (d)    Further, contrary to GAAP, as set forth in FASB Statement of Financial Accounting

4   Standard ("SFAS") No. 57, Tut failed to disclose the sham affiliate transaction with Reflex.  Two weeks

5   before Tut filed the Form 10-Q, it purchased 1.3 million shares of Reflex stock and began shipping massive

6   amounts of product that Reflex did not use and never paid for.  GAAP, as set forth in SFAS No. 57,

7   requires that financial statements include disclosures of mateial related party transactions.  According to

8   SFAS No. 57, ¶2, these disclosures must include the nature of the relationship involved, a description of

9   transactions, the dollar amount of transactions for each of the periods for which income statements are

10  presented and the amounts due from related parties as of the balance sheet date.  A related party includes

11  affiliates, principal owners of an enterprise, its management, or other parties with which the enterprise may

12  deal if one party controls or can significantly influence the management or operation policies of the other.

13  A party is also a related party if it can significantly influence the management or operating policies of the

14  transacting parties or if it has an ownership interest in one of the transacting parties.  *See* SFAS No. 57,

15  ¶24(f).

16         70.    <u>Defendants Sell Their Stock – Additional Circumstantial Evidence of Scienter</u>: As a result

17  of defendants' false positive statements Tut's stock price increased 26% from $68.25 on 7/19/00 to

18  $86.3125 on 7/20/00.  The Company's stock price continued to rise in 7/00 and 8/00 reaching a Class

19  Period high of $120.375 on 8/29/00.  With full knowledge of the undisclosed product problems, recall,

20  loss of the Company's largest customer (Trigem) and the sham Reflex sales, each of the Individual

21  Defendants suddenly sold their shares in unison during a narrow three week period from 8/1/00-8/24/00.

22  Taking advantage of the Company's inflated stock price, defendants sold 188,100 shares, or 46.5% of their

23  total available holdings for illegal insider trading proceeds of $17 million.  Many of the Individual Defendants

24  sold their shares on the same day.  The sales were at prices between $83.13 and $104.3, far in excess of

25  the $5.8438 price at which Tut stock traded at on 2/1/01.

26         71.    On 8/24/00, following the huge increase in the price of the Company's stock and defendants'

27  suspicious and coordinated sales (which were not yet publicly disclosed), Kaufman Bros. analyst Clifton

28  Gray issued a report downgrading his rating on Tut's stock from "STRONG BUY" to "BUY."  Gray

1  attributed the downgrade to concerns over valuation and the remaining upside left in the stock.  Gray stated

2  that the Company's current valuation (Tut's market capitalization was nearly $2 billion based on the

3  $110.9375 closing price of the Company's stock on 8/23/00) demanded significant upside to estimates.

4         72.    In 9/00 and 10/00, the price of Tut's stock declined closing at $51.875 on 10/17/00.  In

5  addition to the valuation concerns reported by Clifton Gray on 8/24/00, several analysts attributed the

6  decline to broadband access equipment companies (Tut's competitors) preannouncing disappointing 3Q00

7  earnings and CLECs (Tut's customers) issuing earnings warnings and filing for bankruptcy.

8         73.    On 10/4/00, Jeffries & Company, Inc., analyst J.J. Bellace issued a report downgrading the

9  rating on Tut's stock from "Buy" to "Accumulate" due to the investment community's concerns about

10  financing problems recently disclosed by several CLECs and BLECs.

11         74.    On 10/6/00, Lehman Brothers analyst Steven Levy issued a report disclosing that some

12  CLECs had issued earnings warnings and declared bankruptcy and that some broadband access equipment

13  companies had preannounced disappointing 3Q00 earnings.  Nevertheless, Levy reported that Tut was

14  expected to report impressive 3Q00 results on 10/18/00 and that international sales, particularly to Korea,

15  were expected to be an important source of revenue.

16  **B.**    **Defendants' False and Misleading Statements Regarding Tut's 3Q00 Financial Results**

17         75.    <u>False Statement</u>: On 10/18/00, Tut announced its 3Q00 results in a release which stated:

18  Tut Systems, Inc. More Than Triples Revenue

19  Tut Systems, Inc. today reported a strong third quarter performance with ***revenue for the***
20  ***quarter ended September 30, 2000, of $28.6 million***, an increase of 246%, compared
    to revenue of $8.3 million for the quarter ended September 30, 1999.

21      ***The net income for the quarter ended September 30, 2000, excluding certain***
    ***noncash purchase acquisition expenses of $2.5 million, was $1.9 million, or $0.11***
22  ***per share***, compared with a net loss for the quarter ended September 30, 1999, of $(1.6)
    million or $(0.13) per share.  Net loss for the quarter ended September 30, 2000, including
23  noncash purchase acquisition expenses, was $(0.6) million.

24      "***We are very proud to announce yet another successful quarter – our fifth***
    ***consecutive quarter of triple digit growth***," said Tut Systems, Inc. President and Chief
25  Executive Officer, Sal D'Auria.  "Additionally, ***our revenue this quarter represented***
    ***three times the revenue we reported a year ago – a great indication of our financial***
26  ***position and the demand for our product line***.

27      "***Tut is also proud to announce today that we have shipped over 308,000***
    ***lines and over 23,000 building systems to date to the multi-tenant unit (MTU)***
28  ***market***," said D'Auria. "And, with the upcoming launch of IntelliPOP MTU (TM), we feel

1
2
3

confident we can continue to widen our leadership position.  The IntelliPOP platform based on Tut's core technology, the Signature Switch (TM), empowers service providers to create and control an unlimited array of services in multi-tenant environments – allowing them to extract new value from their broadband investments.  We expect that this dynamic product line will help Tut continue to win in the MTU market."

4   The Company's financial results reported in the 10/18/00 press release were repeated to the market in

5   reports issued on 10/19/00 by Kaufman Bros. analyst Clifton Gray, Chase Hambrecht & Quist Inc., analyst

6   I. Grozovsky, Lehman Brothers analyst Steven Levy and Frost Securities analyst Syed Haider (copies of

7   these reports are attached to the Appendix and incorporated by reference).

8          76.    Reasons Why and Defendants' Knowledge that Their Statements Were False and

9   Misleading: The financial results and other positive statements contained in the 10/18/00 press release and

10   the 10/19/00 analyst reports were materially false and misleading for the reasons set forth in ¶¶67 and 69.

11   Defendants knew they were misleading the analysts into serving as conduits for distributing false information

12   to investors.

13          (a)    As detailed in ¶¶37-65, defendants knew the revenue and EPS numbers reported

14   for 3Q00 and the nine months ending 9/30/00 were materially overstated because Tut (1) improperly

15   recognized revenues on sales of defective products, (2) improperly recognized revenues on contingent sales,

16   (3) improperly recognized revenues on the undisclosed affiliate transaction with Reflex where collection was

17   not probable, (4) failed to establish adequate reserves for obsolete and excess inventory and (5) failed to

18   establish adequate reserves for uncollectible accounts receivables.

19          (b)    As detailed in ¶¶37-59, Tut improperly recognized revenues on sales of defective

20   product that was subject to a major recall and improperly recognized revenues on sales to its largest

21   customers that were not required to pay Tut until they had resold the product.

22          (c)    In addition to the product problems and recall detailed in ¶¶37-47, Tut's failure to

23   adequately reserve for obsolete, defective and excess inventory was reflected by another increase in net

24   inventory from $15.4 million as of 6/30/00 to $22.3 million as of 9/30/00.  Despite the product problems,

25   recall and corresponding increase in inventory, Tut incurred a $385,000  expense in 3Q00 to increase its

26   inventory reserve to $1.9 million at 9/30/00.  After the Class Period, Tut incurred more than $48 million in

27   charges to reserve for obsolete, defective and excess inventory.

28

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL
SECURITIES LAWS- C-01-2659-CW                                                          - 27 -

1    (d)    As detailed in ¶¶62-65, Tut's failure to adequately reserve for uncollectible

2    receivables was reflected by the further increase and deterioration of receivables.   After receivables

3    increased from $11.7 million at 3/31/00 to $15.4 million at 6/30/00, they doubled to $30.6 million at

4    9/30/00. After DSOs increased to 67 days at 6/30/00, they rose further to 97 days at 9/30/00.  However,

5    the bad debt reserve, which was only increased by $202,000 in 2Q00 to $537,000, was only increased by

6    $6,000 to $543,000 as of 9/30/00.

7    (e)    As defendants knew from Tut's Aged Receivables Report, one of the reasons the

8    level of receivables had increased and deteriorated was the failure of Darwin and Reflex (Tut's second and

9    third largest customers in 2000) to pay Tut as required by the CPAs.  Darwin, which Tut reported in its SEC

10    filings had purchased $5.2 million of product in the first six months of 2000 and $2.7 million in 3Q00, had

11    only paid Tut approximately $1.5 million by 10/18/00.  Reflex had not paid for any of the approximately $7

12    million of product purchased from Tut in 3Q00.   Other customers were not paying due to the product

13    problems and recall.  After the Class Period, Tut incurred more than $20 million in charges to increase the

14    bad debt reserve to $21.2 million as of 12/31/00.  Approximately $12 million of that amount related to the

15    Darwin and Reflex accounts.

16    (f)    Thus, contrary to the representation made in the 10/18/00 press release, defendants

17    knew that Tut's revenue in 3Q00 misrepresented Tut's financial position and the demand for the Company's

18    product line.  When Tut finally accurately accounted for its inventory and receivables, Tut incurred more than

19    $91 million in charges to reserve or write-off (1) obsolete, defective and excess inventory ($48 million), (2)

20    uncollectible receivables ($21 million), (3) cancelled purchase orders ($19 million) and (4) the Company's

21    equity investment in three customers including Reflex and Darwin ($3.1 million).

22    77.    Despite the positive false statements made by defendants in the 10/18/00 press release and

23    the analyst reports issued on 10/19/00, the price of Tut's stock declined from $51.875 on 10/17/00 to

24    $37.4375 on 10/18/00 and to $31.1875 on 10/19/00.  Tut led analysts and the financial press to believe

25    that the price decline was the result of the announcement by one of Tut's competitors, Copper Mountain

26    Networks, Inc., that it expected 4Q00 financial results to decline.  However, Tut's financial problems were

27    specific to the Company.

28

78.   <u>False Statement</u>: On 11/14/00, Tut filed its 3Q00 Form 10-Q with the SEC. The Form 10-Q was signed by defendant Caldwell and repeated the financial results contained in the 10/18/00 press release and the analyst reports issued on 10/19/00. It was represented in the Form 10-Q that the financial statements contained therein reflected all adjustments necessary to present fairly the Company's financial position, results of operations and cash flows as of and for the three and nine months ending 9/30/00. The Form 10-Q also included the following representations:

Manufacturing or design defects in our products *could* harm our reputation and business.

Any defect or deficiency in our products *could* reduce the functionality, effectiveness or marketability of our products. These defects or deficiencies *could* cause orders for our products to be canceled or delayed, reduce revenue, or render our product designs obsolete. *In that event*, we would be required to devote substantial financial and other resources for a significant period of time in order to develop new product designs. *We cannot assure you that we would be successful in addressing any manufacturing or design defects in our products or in developing new product designs in a timely manner, if at all*. Any of these events, individually or in the aggregate, *could* harm our business, financial condition and results of operations.

*   *   *

A majority of our sales comes from a small number of customers; *if* we lose any of these customers, our sales could decline significantly.

The majority of our annual sales come from a small number of our customers. Our 10 largest customers accounted for 78% of net sales for the nine months ended September 30, 2000 and 62% of net sales in 1999. Because we are dependent upon continued revenue from our 10 largest customers, any material delay, cancellation or reduction of orders from these or other major customers could cause our sales to decline significantly. Trigem Infocomm, Inc., Reflex Communications, Inc. and Darwin Networks, Inc. accounted for 19%, 13% and 12%, respectively, of our net sales for the nine months ended September 30, 2000. Rycom CCI, Inc. accounted for more than 10%, respectively, of our annual net sales in 1999. There is no guarantee that we will be able to retain any of our 10 largest customers or any other accounts. In addition, our customers may materially reduce the levels of services ordered from us at any time. This could cause a significant decline in our net sales and we may not be able to reduce the accompanying expenses at the same time.

79.   <u>Reasons Why and Defendants' Knowledge that the Financial Results and Statements About Product Defects Contained in the Form 10-Q Filed with the SEC on 11/14/00 Were Materially False and Misleading</u>: The financial results reported in the Form 10-Q were false and misleading for the reasons set forth in ¶¶67, 69 and 76.

(a)   Defendants knew the statement that manufacturing or design defects "could" harm Tut's business was false and misleading. All of the Individual Defendants attended weekly staff meetings

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL
SECURITIES LAWS- C-01-2659-CW                                                        - 29 -

1   where the product problems and recall were discussed.  Tut had to stagger notifying its customers of the

2   recall because it did not have enough product to replace the defective product.  Sales and customer support

3   were fighting over the new product.  Thousands of Expresso System platforms were being returned

4   increasing Tut's supply of defective,  obsolete and excess inventory.  In short, manufacturing and design

5   defects *already had* harmed Tut's business.

6          (b)     Defendants also knew the statement that sales "could" decline significantly "if" Tut

7   lost any of its large customers cancelled or reduced orders was false and misleading because Trigem, the

8   Company's largest customer, would not be purchasing any product in 3Q00.  Further, Tut's other large

9   customers (Darwin, I-Quest, CAIS Internet) were experiencing financial problems of their own and were

10  delinquent in paying their accounts.

11         (c)     Item 303 of SEC Regulation S-K, 17 C.F.R. 229.303(a)(3)(ii) required Tut to

12  describe any known trends or uncertainties that the registrant reasonably expected would have material

13  favorable or unfavorable impact on net sales or revenues or income from continuing operations.

14  Consequently, the product problems, recall, loss of Trigem and the delinquency of Tut's other customers

15  were required to be disclosed.

16         (d)     Further, contrary to GAAP, as set forth in FASB SFAS No. 57, Tut failed to

17  disclose the affiliate transaction with Reflex.  GAAP, as set forth in SFAS No. 57, requires that financial

18  statements include disclosures of mateial related party transactions.  According to SFAS No. 57, ¶2, these

19  disclosures must include the nature of the relationship involved, a description of transactions, the dollar

20  amount of transactions for each of the periods for which income statements are presented and the amounts

21  due from related parties as of the balance sheet date.  A related party includes affiliates, principal owners

22  of an enterprise, its management, or other parties with which the enterprise may deal if one party controls

23  or can significantly influence the management or operation policies of the other.  A party is also a related

24  party if it can significantly influence the management or operating policies of the transacting parties or if it has

25  an ownership interest in one of the transacting parties.  *See* SFAS No. 57, ¶24(f).

26  **C.     Defendants' False and Misleading Statements Regarding Tut's Revised Guidance for
        4Q00 Financial Results**

27

28

1   80.   <u>False Statement</u>: On 11/30/00, Tut announced that it expected 4Q00 revenues to be only

2   $15-$18 million rather than the $35+ million defendants had led the market to expect.  The press release

3   issued in connection with the announcement stated in part:

4   Tut Systems, Inc., a leading provider of multi-service broadband systems for multi-
    tenant buildings, today reported that it expects financial results for the quarter ending

5   December 31, 2000 to be lower than consensus estimates ***due to various factors,
    including tightening in the capital markets, which have affected some of Tut's***

6   ***service provider customers***.

7   Based on currently available information, the company is targeting revenue of
    between $15 million and $18 million for the fourth quarter of 2000.  Additional guidance

8   and information will be discussed in a conference call scheduled for later today.  After
    today's conference call, Tut will not report on the progress of the quarter until actual results

9   are announced.

10   81.   This was a shocking surprise to the market.  As a result, Tut's stock price collapsed to

11   below $10 per share.

12   82.   <u>Reasons Why and Defendants' Knowledge that the Statements Made in the 11/30/00 Press</u>

13   <u>Release Were Materially False and Misleading</u>: The statements made by defendants in the 11/30/00 press

14   release were materially false and misleading for the reasons set forth in ¶¶67, 69, 76, 79.  Specifically,

15   defendants failed to disclose (1) the product problems and recall, (2) the fact that Tut's earnings were

16   materially overstated due to the Company's failure to establish adequate reserves for uncollectible

17   receivables and obsolete, defective and excess inventory, and (3) that revenues were materially overstated

18   due to Tut's practice of improperly recognizing revenues on contingent sales, sales of defective product and

19   sales to related parties.

20   83.   Subsequent to the 11/30/00 disclosure, Tut hosted a conference call on 11/30/00 to discuss

21   its business and prospects in light of this disclosure.  Based on Tut management's statements to analysts,

22   including on the 11/30/00 conference call, analysts wrote reports about Tut and its prospects.  These reports

23   were consistent with and repeated management's false and misleading statements, which statements had been

24   made to the analysts with the intention they would be repeated to the market.

25   84.   <u>False Statement</u>: On 11/30/00, Kaufman Bros. issued a report on Tut by Clifton Gray,

26   which stated in part:

27   Tut Systems preannounced results for the fourth quarter, slashing its previous
    estimates.  The company is now expecting sales during the quarter to be between $15 and

28   $18 million.  This is a more than 50% decrease versus our prior estimate of $36 million.  On

1
2
3
its conference call the company stated that its customers are very concerned about the availability of funding from the capital markets and they have decided to scale back their service deployments and focus on properties with the most favorable prospects. End customer demand has not slowed, but service providers have become much less aggressive in their deployment plans due to real and potential funding issues.

4
5
6
In addition, revenues from Korea will not likely rebound in the March period as previously expected; instead *we believe Korea will begin to pick up again towards the summer of 2001*. While we did not expect Korea to account for any significant portion of the growth in coming quarters, the apparent weakness in this area makes reacceleration for Tut's total business that much more difficult.

7
8
9
10
11
*The company was also unwilling to answer any questions regarding aging receivables*. Highlighting this problem, Tut cited one major customer, which is cash flow positive, who has asked for a payment plan from Tut in order to conserve capital. *While the company maintains its customers are all in solid financial condition, this latest development certainly highlights the difficulties associated with negative cash flow businesses in this market*. Because of these difficulties, we believe some aging receivables from certain customers could be at risk. If the company does not receive payment from these customers it will likely have to restate sales from those accounts.

12
13
85.  Underline: False Statement: On 12/01/00, Lehman Brothers issued a report on Tut by Steven Levy which stated:

14
15
16
17
18
19
Citing a precipitous drop in visibility in the last two weeks relating almost totally to its domestic carrier customers, *Tut is now anticipating 4Q revenues to fall within a range of $15-18 million and a pro forma EPS loss between $0.27-$0.36 cents*. We had previously been forecasting revenues of $35.5 million and EPS of $0.19. Based on this surprising development we have lowered our projections for 4Q to $16 million in revenues and a loss per share of $0.32. Although we find this news rather disappointing, it is our opinion that the fundamental drivers, namely Tut's unique business plan and strong management team, remain in place. Although we are lowering our 12-month price target to $25, we are reiterating our 1 Buy rating because of the company's asset value (see below). We further believe that Tut is capable of weathering any short-term problems and should be able to deliver strong quarterly performance once the capital markets for its customer base becomes more friendly.

20
\*   \*   \*

21
22
23
24
25
26
27
28
*Accounts receivables days sales outstanding, DSO's, ramped up at the end of 3Q because nearly 70% of the quarter's sales were booked in the last 45 days of the quarter*. Tut had hoped to bring that number down in 4Q, but this now seems unlikely given the financial state of affairs on the BLEC front. *While management indicated only one of its customers had negotiated plans to postpone payment, they hinted that additional customers could seek more favorable payment plans in the near future, although none have made the request so far*. Thus, DSO's at the end of December are likely to come in at a higher level than the 74 days registered at the end of 3Q, according to our calculations. *An additional note of importance on the balance sheet is inventories, which should also see an increase during fiscal 4Q. Tut had been anticipating robust demand for its products throughout the end of year, but the sudden slowdown in the MTU market should leave the company with higher than normal inventory levels for the fiscal fourth quarter*. The inventories are not likely to go stale and should not be a source of concern, in our view.

1        86.   <u>Defendants' Knowledge of and Reasons Why the Statements Repeated to the Market by</u>

2  <u>the Analysts were False and Misleading</u>: The statements by defendants that were repeated to the market

3  through the analysts were false and misleading for the reasons set forth in ¶82. Defendants knew they were

4  misleading the analysts into serving as conduits for distributing false information to investors.

5        (a)    Defendants continued to conceal the product problems, recall and financial

6  deterioration at Tut. Nothing was revealed about the recall. As reported by Kaufman Bros. analyst Gray,

7  the Company refused to answer questions regarding aging receivables and maintained that its customers

8  were all in solid financial condition. Defendants knew that Tut's customers were not in solid financial

9  condition but were delinquent in paying their accounts. Defendants knew the Darwin and CAIS accounts

10  were "on hold," and that Reflex had not, and would not, pay for any of the product shipped to them in

11  3Q00. Defendants also knew that customers were not paying for defective product that was subject to the

12  recall.

13        (b)    Defendants knew the statement repeated by Lehman Brothers analyst Levy that

14  "only one of [Tut's] customers had negotiated plans to postpone payment" was false and misleading because

15  many of Tut's customers were not paying their bills due to their own financial problems or because they were

16  shipped defective product.

17        (c)    Defendants knew that 4Q00 revenues would not be $15-$18 million and that the

18  pro forma EPS loss would not be between $0.27 and $0.36 as reported by Lehman Brothers analyst Levy.

19  Defendants knew Tut's revenues would be much lower due to the financial difficulties of its customers, the

20  loss of Trigem as a customer and the problems with Tut's products. Defendants knew that Tut would have

21  to incur millions of dollars in charges in 4Q00 to reserve for uncollectible receivables and worthless

22  inventory.

23        87.   <u>False Statement</u>: On 1/8/01, Tut issued a release that stated:

24          Tut Systems, Inc., a leading provider of multi-service broadband systems for multi-
tenant buildings, today reported that it expects financial results for the quarter ending

25  December 31, 2000 to be lower than previously anticipated. Tut had previously anticipated
revenues for the quarter in the range of $15-18 million. As a result of continuing adverse

26  developments in the telecommunications industry, the company expects revenues for the
quarter to be in the range of $6-7 million. ***The company cited rescheduling of orders***

27  ***and additional curtailing of credit availability as key reasons for the downturn***.
The company is in the process of completing its quarterly close and as a result, earnings per

28  share numbers are not available. However, in light of increased risks, ***the company***

*anticipates that it will record significant additional balance sheet reserves including those related to allowances for doubtful accounts. The reserves have not yet been quantified*.

88.   <u>Defendants' Knowledge and Reasons Why the 1/8/01 Press Release Was False and Misleading</u>: The statements made by defendants in the 1/8/01 press release were false and misleading for the reasons set forth in ¶82.  Tut's financial decline was a function of Company specific problems.

(a)   Although the Company stated that it would record significant additional balance sheet reserves related to allowances for doubtful accounts, it continued to conceal the product problems and recall and the millions of dollars in reserves that would be required for worthless inventory.  Further, while the Company stated the reserves had not yet been quantified, defendants knew that Tut would be reserving for practically all of its receivables.  Defendants knew that Reflex and Darwin were delinquent and would not pay Tut approximately $12 million due to their financial problems.  Defendants knew Reflex had not paid for any of the approximately $7 million of product shipped to Reflex in 3Q00 and that Reflex had not even used any of the product.

(b)   Defendants also knew, but concealed, that Tut would incur additional expenses to reserve for its stock investments in Reflex and Darwin.  Indeed, Darwin would declare bankruptcy just three days later on 1/11/01.  Defendants knew Tut would be required to write-off its investment in Reflex preferred stock which it had purchased just months earlier in 7/00 when Reflex was shipped approximately $7 million of product.

## DEFENDANTS' SCHEME UNRAVELS

89.   On 1/31/01, Tut shocked the market once again by announcing that in addition to the receivables problems, Tut had taken a $29.3 million charge for overvalued inventory and purchase commitments.  The press release issued in connection with the announcement stated in part:

Tut Systems, Inc. today announced its results for the fourth quarter of 2000.  ***Revenue for the quarter ended December 31, 2000 was $5.9 million***, compared to revenue of $10.6 million for the quarter ended December 31, 1999.

***The net loss for the quarter ended December 31, 2000***, excluding certain noncash purchase acquisition expenses of $2.5 million, ***was $(65.5) million, or $(4.12) per share***, compared with a net loss for the quarter ended December 31, 1999, of $(1.5) million or $(0.13) per share.  Net loss for the quarter ended December 31, 2000, including noncash purchase acquisition expenses, was $(68.0) million.

The foregoing results and other financial matters discussed herein are the preliminary actual results for the quarter. Tut's auditors have not yet completed their review of the financial statements in connection with the annual audit. The audit could result in adjustments to the preliminary results announced today.

Continuing adverse developments affecting the telecommunications industry have affected the current financial condition of certain Tut customers. As a result, *Tut has increased its allowance for doubtful accounts by approximately $22.1 million* which is reflected in general and administrative expenses. *In a related move, Tut recorded a $3.1 million loss to reflect the estimated impairment of the value of its equity investments in certain customers. Tut also added a provision for loss on purchase commitments and abandoned products of $29.3 million which reflects its decision to reduce future inventory manufacturing commitments and to exit certain noncore product lines*. Tut also disclosed that included in the balance sheet at December 31, 2000 is a short-term investment of $9.2 million in commercial paper issued by Southern California Edison Company which is currently in default. Tut believes that the ultimate realization of this investment is not currently determinable. Including this investment, Tut had a cash, cash equivalent and short term investment position of approximately $102.6 million at December 31, 2000.

To operate more efficiently, *Tut will reduce its work force by 10% effective immediately* and announced that the company's marketing and engineering employees will report to Mark Carpenter, Vice President of Products, and Ian Moir, Vice President of Technology.

*Tut also announced that Tom Warner, Vice President of Engineering and Matt Taylor, Chief Technical Officer and Board Member, have left the company to pursue other interests*.

90.     After this news, Tut's stock dropped to below $6 per share and has continued to decline since that time, falling to below $2 per share in late 6/01, as investors have become increasingly aware of how poor Tut's prospects are and its past results actually were.

## POST CLASS PERIOR EVENTS FURTHER DEMONSTRATING DEFENDANTS' FRAUD

91.     Even with the revised guidance issued by the Company in 11/00 and 1/01, analysts were stunned by the disastrous results announced on 1/31/01. J.P Morgan H&Q analyst Michael Nieberg reported that the December quarter was "dismal" and a "train wreck." Nieberg immediately slashed 2001 revenue and EPS estimates. Kaufman Bros. analyst Gray reported that Tut was "crippled" and that the future would be "treacherous" for the Company. Gray downgraded Tut shares from "ACCUMULATE" to "HOLD." Frost Securities analyst Syed Haider questioned whether Tut had been mortally wounded.

92.     Despite the horrible financial results, the analysts did note that Tut was still well capitalized, had no debt and reported cash and cash equivalents of approximately $100 million which equated to

1    approximately $6 per share.  However, in the first three quarters of 2001, Tut reported a $97.8 million net

2    loss that reduced the Company's cash and cash equivalents to approximately $56 million.

3         93.    In every quarter since the end of the Class Period, Tut has reported declining revenues,

4    additional and substantial charges to reserve for obsolete and excess inventory, and massive losses.

| | 1Q01 | 2Q01 | 3Q01 | 4Q01 |
|---|---|---|---|---|
| Revenues | $4,887 | $2,722 | $3,967 | $2,172 |
| Net Income | ($33,969) | ($13,999) | ($49,382) | ($6,526) |
| EPS | ($2.10) | ($0.86) | ($3.05) | ($0.40) |
| Provisions for Inventories | $18,633 | $3,244 | $11,425 | N/A |

10        94.    Moreover, after improperly recognizing revenues in violation of GAAP on sales to customers

11   where collectibility was not probable, the Company disclosed in 2001 that it was now deferring revenue

12   recognition on sales to customers where collection was uncertain due to customers requesting extended

13   payment terms.  On 4/9/01 Tut announced  it had shipped more than $5.7 million in product in 1Q01 but

14   would not be recognizing revenues on all shipments because collection was uncertain.  The Company also

15   disclosed it would host a conference call on 4/18/01 to discuss 1Q01 results.

16        95.    On 4/17/01 Tut postponed the conference call from 4/18/01 to 4/23/01. On 4/23/01, Tut

17   again postponed the conference call to 5/10/01 and announced another reduction in force.  After announcing

18   a 10% reduction on 1/31/01, Tut disclosed another 28% of the Company's workforce would be let go.

19        96.    On 5/10/01, Tut finally announced 1Q01 revenues of $4.9 million and a net loss of $34

20   million or a $2.10 loss per share.  On 5/11/01, Lehman Brothers analyst Andrea Green reported Tut's 1Q01

21   financial results were "clearly disappointing" and that Tut had deferred revenues related to some new

22   customers as well as customers requesting extended payment terms. J.P. Morgan analyst Michael Neiberg

23   noted Tut's "alarming cash burn of $26 million" in the quarter.

24        97.    On 8/1/01 Tut announced that 2Q01 revenues had actually declined from 1Q01 to $2.7

25   million and that defendant Caldwell had resigned for personal reasons.  The Company reported a net loss

26   for the quarter of $14 million or ($0.86) EPS.  Unlike the Company's 1Q01 earnings release, the 8/1/01

27   earnings release did not disclose that Tut had deferred revenue recognition in 2Q01.  However, Lehman

28

1   Brothers analyst Andrea Green reported the Company did not recognize $1 million of shipments as revenue

2   due to customers' financial difficulties.

3        98.     On 10/31/01 Tut announced another dismal quarter reporting revenues of $3.9 million and

4   a net loss of $49.8 million or ($3.05) EPS. The accumulated deficit increased to $228.4 million.

5        99.     On 1/31/02 Tut announced horrible 4Q01 and F01 results.  Revenues in 4Q01 were $2.2

6   million and the net loss was $6.5 million or ($0.40) EPS.  For F01, Tut's net loss was a staggering $104.3

7   million or ($6.39) EPS.

8        100.    In 1/99 and 3/00 Tut raised approximately $188 million from public investors.  In the almost

9   three year period since Tut went public in 1/99, the Company has never reported a profit and has lost more

10  than $190 million.  Tut's stock price has not recovered and currently trades at less than $2 per share.

11                **TUT'S FALSE FINANCIAL REPORTING DURING THE CLASS PERIOD**

12       101.    Tut's results in 2Q00 and 3Q00 were materially false and misleading.  Defendants caused

13  Tut to report inflated financial results during the Class Period by (1) improperly recognizing revenues on

14  sales of defective product, (2) improperly recognizing revenues on contingent sales to its largest customers

15  including Trigem, Darwin and Reflex, (3) failing to adequately reserve for uncollectible receivables and (4)

16  failing to adequately reserve for obsolete, defective and excess inventory.  The fact that Tut has incurred

17  more than $91 million of charges to reserve for uncollectible accounts receivables, inventories, equity

18  investments in customers and cancelled purchase orders is essentially an admission that the results as

19  originally reported were materially false and in violation of GAAP.

20       102.    GAAP are those principles recognized by the accounting profession as the conventions, rules

21  and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X

22  (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in

23  compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.

24  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception

25  that interim financial statements need not include disclosure which would be duplicative of disclosures

26  accompanying annual financial statements.  17 C.F.R. §210.10-01(a).

27

28

**A.      Tut's Improper Revenue Recognition and Failure to Adequately Reserve for Accounts Receivable with Doubtful Collectibility**

103.      Pursuant to GAAP, as set forth in FASB Statement of Concepts No. 5 and SOP 97-2, and Tut's publicly reported revenue recognition policy, revenues could not be recognized unless all of the following criteria are met: (1) persuasive evidence of an arrangement exists, (2) delivery has occurred, (3) the fee is fixed and determinable, and (4) collectibility is probable.

104.      Further, pursuant to GAAP as set forth in SFAS No. 48, revenues can not be recognized at the time of sale where the buyer has the right to return the product unless (1) the price is substantially fixed or determinable at the time of sale, (2) the buyers payment obligation is not contingent on resale, (3) the amount of future returns can be reasonably estimated.

105.      Defendants knew collectibility of the revenues recognized during the Class Period was not probable due to the product problems and recall. Defendants also knew that collectibility was not probable due to the financial problems confronting its largest customers including Darwin and Reflex whose accounts were delinquent during the Class Period. Indeed, Darwin declared bankruptcy on 1/11/01 and Reflex declared bankruptcy on 3/28/01. Further, defendants knew that contrary to the terms of the CPAs, Tut's largest customers were not required to pay for product until resale and that Tut's customers had the right to return unsold product.

106.      GAAP, as set forth in FASB Statement of Financial Accounting Standards ("SFAS") No. 5, *Accounting for Contingencies*, states that any loss to be expected from an uncollectible receivable should be accrued when it is probable and when the amount of such loss can be reasonably estimated. *See* SFAS No. 5, ¶8. According to SFAS No. 5, ¶22:

> Losses from uncollectible receivables shall be accrued when both conditions in paragraph 8 are met [the loss is probable and the amount of loss can be reasonably estimated]. Those conditions may be considered in relation to individual receivables or in relation to groups of similar types of receivables. If the conditions are met, accrual shall be made even though the particular receivables that are uncollectible may not be identifiable.

107.      In violation of GAAP, Tut failed to make timely and adequate accrual for uncollectible receivables despite knowing the following:

(a)      Receivables had increased 48% in the 2Q00, even though sales increased only 27%.

1   (b)     In the 3Q00, receivables increased an additional 99%, even as sales increased only

2   36%.

3   (c)     Customer Darwin was having trouble paying bills in 7/00 and failed to pay Tut $5.0

4   million.  Despite getting some financing from Cisco in 10/00, Darwin filed bankruptcy in 1/01.

5   (d)     Customer Reflex failed to pay Tut for any of the approximately $7 million of product

6   shipped to Reflex in 3Q00 and filed for bankruptcy in 3/01.

7   (e)     Customer I-Quest was an Asian firm which focuses on installing equipment in high-

8   end hotels targeting mainly business travelers needing broadband Internet access.  However, I-Quest was

9   responsible for paying for investments in the infrastructure and had to rely on usage fees to provide cash.

10  Prior to the 4/00 collapse in technology-related stocks, I-Quest had planned a public offering.  Upon the

11  collapse, I-Quest was forced to rethink this plan and its funding was much more precarious.

12  (f)     CAIS Internet, a delinquent Tut customer whose account was "on hold" by 9/00

13  due to nonpayment, suffered through increasing losses and liabilities and minimal revenue in 2000:

| | 4Q99 | 1Q00 | 2Q00 | 3Q00 |
|---|---|---|---|---|
| Revenues | $4.68M | $6.87M | $8.65M | $11.1M |
| Losses | $23.7M | $24.7M | $41.3M | $36.1M |
| Liabilities | $59.6M | $72.3M | $99.1M | $153.4M |

18  (g)     Despite the tripling of receivables from $10.4 million at 3/31/00 to $30.6 million at

19  9/30/00 and the increase in DSOs to 97 days at 9/30/00, Tut's bad debt reserve was increased by a meager

20  $200,000 during the Class Period.  The bad debt reserve increased from $335,000 at 3/31/00 to $543,000

21  at 9/30/00.  After the Class Period the bad debt reserve was increased by $22.3 million and Tut wrote off

22  another $1.7 million of receivables.

23  **B.      Tut's Improper Accounting for Inventory**

24  108.    GAAP, as set forth in Accounting Research Bulletin ("ARB") No. 43, Chapter 4, *Inventory*

25  *Pricing*, requires that inventories be recorded at the lower of cost or market.  ARB No. 43, Chapter 4,

26  Statement 5, states:

27  A departure from the cost basis of pricing the inventory is required when the utility of the
    goods is no longer as great as its cost.  Where there is evidence that the utility of goods, in
28  their disposal in the ordinary course of business, will be less than cost, whether due to

1    physical deterioration, obsolescence, changes in price levels or other causes, the difference
2    should be recognized as a loss in the current period.  This is generally accomplished by
     stating such goods at a lower level commonly designated as *market*.

3    (Emphasis in original.)

4         109.    During the Class Period, the Company recalled Expresso System Platforms due to design
5    and manufacturing defects that caused the systems to overheat and fail.  Further, the Company suffered from
6    diminishing demand for its products.  The foregoing resulted in Tut accumulating millions of dollars worth
7    of excess inventory and liabilities associated with non-cancellable purchase commitments.  In fact, Tut had
8    excess inventory in the channel and many of its sales were generated through sales to non-creditworthy
9    customers.  Pursuant to GAAP, the Company was required to evaluate its inventory at each quarter-end
10   and record losses for the excessive inventory Tut held.  However, in order to meet their own aggressive
11   earnings estimates, the Individual Defendants caused the Company to not take adequate reserves for excess
12   and overvalued inventory.

13        110.    Ultimately, in the 4Q00 (a quarter subject to audit by Tut's independent auditors) Tut
14   admitted that as part of its write-down of assets, it had incurred (1) a $19 million charge related to cancelled
15   purchase orders, (2) an $8.2 million charge related to the Company's decision to abandon further
16   development and sale of certain product lines, (3) a $6.3 million charge to reserve for excess and obsolete
17   inventory, and (4) a $1.1 million charge to write-off inventory.  All of the charges except the $19 million
18   charge caused Tut's reserve for obsolete and excess inventory to increase from $1.9 million at 9/30/00 to
19   $13.8 million at 12/31/00.

20   Inventory Reserve at 12/31/99           $418
21   Provisions added in 1Q00-3Q00           $1,475
22   Provisions added in 4Q00                $12,993
23   Inventory write-off                     ($1,131)
24   Inventory Reserve at 12/31/00           $13,755

25        111.    In the first three quarters of 2001, the Company has incurred $33.3 million of additional
26   charges and increased the reserve for obsolete and excess inventory to approximately $47 million.

27        112.    Thus, after the Class Period, Tut incurred approximately $65 million in charges related to
28   defective, obsolete and excess inventory.  The magnitude of the inventory related charges alone confirms

1  that defendants caused Tut to materially overstate inventory and earnings throughout the Class Period.  Had

2  Tut adequately reserved for excess, obsolete and defective inventory during the Class Period, such massive

3  charges would have been unnecessary.

4  **INSIDER TRADING**

5          113.    As alleged herein, defendants acted with scienter in that defendants *had actual knowledge*

6  that the public documents and statements issued or disseminated in the name of the Company were

7  materially false and misleading; knew that such statements or documents would be issued or disseminated

8  to the investing public; and knowingly and substantially participated in the issuance or dissemination of such

9  statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein

10  in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Tut, their

11  control over and/or receipt and/or modification of Tut's allegedly materially misleading statements and/or

12  their associations with the Company which made them privy to confidential proprietary information

13  concerning Tut, participated in the fraudulent scheme alleged herein.  This scheme: (a) deceived the investing

14  public regarding Tut's business, product capabilities, financial results, demand, growth, operations and the

15  intrinsic value of Tut securities; and (b) allowed Company insiders, several of whom are named as

16  defendants herein, to sell 188,100 shares of their Tut securities during the Class Period, while in possession

17  of materially adverse, undisclosed information, allowing them to reap illicit proceeds of at least $17.1 million

18  and to profit from the artificial inflation in the price of Tut stock which their scheme had created.  The scheme

19  also caused plaintiffs and other members of the class to purchase or otherwise acquire Tut securities in a

20  market in which the price of Tut securities was artificially inflated.

21          114.    Defendants' insider sales, while not necessary to establish their scienter in this case, are

22  clearly probative of their knowledge and strengthen the already strong inference of scienter which is the

23  result of their actual knowledge of the falsity of their statements.

24          115.    As Tut stock increased in price due to the false positive statements about Tut's business

25  detailed herein, Tut insiders took advantage of this artificial inflation in Tut's stock price by selling the

26  following amounts of Tut stock:

27

28

| Insider | Date | Shares | Price | Value |
|---|---|---|---|---|
| Benett | 08/04/00 | 3,000 | $83.13 | $249,390 |
| | 08/04/00 | 2,000 | $83.25 | $166,500 |
| | **Totals:** | **5,000** | | **$415,890** |
| Caldwell | 08/01/00 | 11,400 | $88.00 | $1,003,200 |
| | 08/17/00 | 6,800 | $100.00 | $680,000 |
| | 08/18/00 | 1,000 | $99.00 | $99,000 |
| | **Total:** | **19,200** | | **$1,782,200** |
| D'Auria | 08/01/00 | 15,000 | $87.08 | $1,306,200 |
| | 08/15/00 | 15,000 | $94.29 | $1,414,350 |
| | 08/21/00 | 17,600 | $98.09 | $1,726,384 |
| | 08/22/00 | 7,500 | $104.13 | $780,995 |
| | **Total:** | **55,100** | | **$5,227,929** |
| Purdy | 08/03/00 | 5,000 | $85.03 | $425,156 |
| | 08/08/00 | 300 | $95.50 | $28,650 |
| | 08/24/00 | 1,477 | $103.75 | $153,239 |
| | 08/24/00 | 2,023 | $85.01 | $171,981 |
| | **Total:** | **8,800** | | **$779,026** |
| Taylor | 08/01/00 | 50,000 | $86.54 | $4,327,050 |
| | 08/02/00 | 25,000 | $85.13 | $2,128,275 |
| | 08/17/00 | 25,000 | $98.90 | $2,472,500 |
| | **Total** | **100,000** | | **$8,927,825** |
| | **TOTALS:** | **188,100** | | **$17,132,870** |

116.    Defendants sales as a percentage of their stock and vested options were as follows:

| Defendant | Total Holdings | Sales | % of Holdings Sold |
|---|---|---|---|
| D'Auria | 215,917 | 55,100 | 25.5% |
| Caldwell | 25,808 | 19,200 | 74.4% |
| Purdy | 30,686 | 8,800 | 28.7% |
| Taylor | 119,973 | 100,000 | 83.4% |
| Benett | 11,890 | 5,000 | 42.1% |
| Total | 404,274 | 188,100 | 46.5% |

1    117.    The timing of defendants' sales was particularly suspicious.  All of the Individual Defendants

2  sold stock in unison during a narrow three week period when Tut's stock traded at its all time high.  Further,

3  the coordinated sales occurred when defendants knew about the product problems and recall, the loss of

4  Trigem (the Company's largest customer) and the sham sales to Reflex.

5

6                                        **Tut Systems, Inc.**
                                   December 31, 1999 - June 29, 2001
7                                        Daily Share Prices



21    118.    The timing of defendants' trading practices are so suspicious that one of the leading financial

22  information analysts, Thomson Financial Network, ranks defendants as "all-star" inside traders.  Thomson

23  conducts extensive statistical analysis of the sales by insider and ranks insider sales by the price changes that

24  occur after each insider's trade.   This ranking information is accessible over the internet at

25  http://insider.thomsonfn.com/tfn/insider.asp.  Thomson's analysis demonstrates that defendants' trades are

26  suspicious in that the price of the stock, on average, drops dramatically after defendants' sales.  Thomson's

27  analysis suggests that defendants' trading has historically occurred at very suspicious times – immediately

28

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL
SECURITIES LAWS- C-01-2659-CW                                                    - 43 -

1    preceding a decline in the price of Tut Systems – exactly what occurred in this case – suggesting either

2    incredibly lucky timing or the systematic use of insider information when trading.

3    **Statistical Evidence of Scienter**

4           119.   Plaintiffs hereby incorporate the contents of the Declaration of Scott D. Hakala, Ph.D.,

5    CFA, attached hereto ("Hakala Decl."), an expert in security market econometrics.  Mr. Hakala is a

6    principal at Business Valuation Services ("BVS"), a national business valuation and consulting firm that

7    operates as a wholly owned subsidiary of Century Business Services, Inc., a publicly traded business

8    services firm (Nasdaq: CBIZ).  Mr. Hakala received a doctor of philosophy degree in economics and a

9    bachelors degree in economics from the University of Minnesota, and earned the professional designation

10   Chartered Financial Analyst ("CFA"), awarded by the Association for Investment Management and

11   Research.

12          120.   Dr. Hakala has shown through scientific method that defendants' sales were based on the

13   possession and use of inside information.  According to Dr. Hakala, the stock sales are statistically

14   associated with the bad news ("subsequent adverse disclosures") revealed to investors.  Dr. Hakala is an

15   expert in the fields of financial statistics.  According to Dr. Hakala, there is less than 1 chance in 100 that

16   defendants traded in the manner they did independent of the possession and use of material, adverse non-

17   public information.  In other words, Dr. Hakala's study concluded that the probability that defendants traded

18   on inside information is greater than **99%.**  This level of certainty far exceeds the scientific acceptance

19   standard (95%), plaintiffs' civil standard of proof, and plaintiffs' pleadings burden.

20          121.   A similar result obtains if each of the Individuals Defendants are analyzed separately.  Under

21   this analysis, Dr. Hakala demonstrated that there was less than 1 in **100** chance that D'Auria, Caldwell,

22   Purdy, Taylor and Benett traded in the manner that they did absent the possession and use of material inside

23   information.  Hakala Decl., ¶6.  These results are summarized in the following chart:

| Defendant | Confidence Level Associated with Test of Independence | Threshold for Statistical Significance | Meets Standard for Inferring Association of Insider Sales with Subsequent Adverse Disclosure |
|---|---|---|---|
| D'Auria | >.99 | .95 | Yes |

| Defendant | Confidence Level Associated with Test of Independence | Threshold for Statistical Significance | Meets Standard for Inferring Association of Insider Sales with Subsequent Adverse Disclosure |
|-----------|----------------------|-------------|------------------|
| Caldwell | >.99 | .95 | Yes |
| Purdy | >.99 | .95 | Yes |
| Taylor | >.99 | .95 | Yes |
| Benett | >.99 | .95 | Yes |
| Defendants as a Group | >.99 | .95 | Yes |

As such, plaintiffs' pleading burden for scienter is met *per se*.

## CLASS ACTION ALLEGATIONS

122.    This is a class action on behalf of purchasers of Tut securities during the Class Period, excluding defendants (the "Class"). Excluded from the Class are officers and directors of the Company, as well as their families and the families of the defendants. Class members are so numerous that joinder of them is impracticable.

123.    Common questions of law and fact predominate and include whether defendants: (i) violated the 1934 Act; (ii) omitted and/or misrepresented material facts; (iii) knew or recklessly disregarded that their statements were false; and (iv) artificially inflated Tut's stock price and the extent of and appropriate measure of damages.

124.    Plaintiffs' claims are typical of those of the Class. Prosecution of individual actions would create a risk of inconsistent adjudications. Plaintiffs will adequately protect the interests of the Class. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## STATUTORY SAFE HARBOR

125.    The statutory safe harbor provided for forward-looking statements ("FLS") does not apply to the false FLS pleaded. None of the ***particular*** oral FLS in Tut's conference calls and meetings with analysts were so identified as required. The defendants are liable for the false FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false and the FLS was authorized and/or approved by an executive officer of Tut who knew that the FLS was false. None of the historic or present-

1  tense statements made by defendants were assumptions underlying or relating to any plan, projection or

2  statement of future economic performance, as they were not stated to be such assumptions underlying or

3  relating to any projection or statement of future economic performance when made nor were any of the

4  projections or forecasts made by defendants expressly related to or stated to be dependent on those historic

5  or present-tense statements when made.

6  **CLAIM FOR RELIEF**

7  126.   Defendants violated §10(b) and Rule 10b-5 by:

8  (a)   Employing devices, schemes and artifices to defraud;

9  (b)   Making untrue statements of material facts and omitting to state material facts

10  necessary in order to make the statements made, in light of the circumstances under which they were made,

11  not misleading; and

12  (c)   Engaging in acts, practices and a course of business that operated as a fraud or

13  deceit upon the Class in connection with their purchases of Tut securities.

14  127.   Class members were damaged.  In reliance on the integrity of the market, they paid

15  artificially inflated prices for Tut securities.

16  **PRAYER**

17  WHEREFORE, plaintiffs pray for judgment as follows: declaring this action to be a proper class

18  action; awarding damages, including interest; and such other equitable/injunctive or other relief as the Court

19  may deem proper.

20

21

22

23

24

25

26

27

28

1

**JURY DEMAND**

2          Plaintiffs demand a trial by jury.

3   DATED:  February 4, 2002                    MILBERG WEISS BERSHAD
                                                  HYNES & LERACH LLP
4                                               JEFFREY W. LAWRENCE
                                                CHRISTOPHER P. SEEFER
5                                               AZRA MEHDI (*pro hac vice*)

6

7                                               /s/ JEFFREY W. LAWRENCE
                                                ─────────────────────────────
8                                                 JEFFREY W. LAWRENCE

9                                               100 Pine Street, Suite 2600
                                                San Francisco, CA  94111
10                                              Telephone:  415/288-4545
                                                415/288-4534 (fax)

11                                              MILBERG WEISS BERSHAD
                                                  HYNES & LERACH LLP
12                                              WILLIAM S. LERACH
                                                DARREN J. ROBBINS
13                                              401 B Street, Suite 1700
                                                San Diego, CA  92101
14                                              Telephone:  619/231-1058
                                                619/231-7423 (fax)
15

16                                              WEISS & YOURMAN
                                                JOSEPH H. WEISS
17                                              551 Fifth Avenue, Suite 1600
                                                New York, NY  10176
18                                              Telephone:  212/682-3025
                                                212/682-3010 (fax)

19                                              Co-Lead Counsel for Plaintiffs

20

21

22

23

24

25

26

27

28   G:\CASES\TUT\CMB80412.cpt

     CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL
     SECURITIES LAWS- C-01-2659-CW                                              - 47 -

1

DECLARATION OF SERVICE BY FACSIMILE
PURSUANT TO NORTHERN DISTRICT LOCAL RULE 23-2(c)(2)

2

3

I, the undersigned, declare:

4

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States

5

and a resident of the County of San Francisco, over the age of 18 years, and not a party to or interest in

6

the within action; that declarant's business address is 100 Pine Street, 26th Floor, San Francisco,

7

California 94111.

8

2.      That on February 4, 2002, declarant served by facsimile the CONSOLIDATED

9

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAW to

10

the parties listed on the attached Service List and this document was forwarded to the following

11

designated Internet site at:

12

**http://securities.milberg.com**

13

3.      That there is a regular communication by facsimile between the place of origin and the

14

places so addressed.

15

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 4th day of

16

February, 2002, at San Francisco, California.

17

18

19

/s/ Carolyn Burr
Carolyn Burr

20

21

22

23

24

25

26

27

28

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL
SECURITIES LAWS- C-01-2659-CW

```
 1    TUT SYSTEMS
      Service List - 02/04/02
 2    Page   1

 3

      COUNSEL FOR PLAINTIFF(S)
 4
    * Kevin J. Yourman
 5    Jordan L. Lurie
      WEISS & YOURMAN
 6    10940 Wilshire Blvd., 24th Floor
      Los Angeles, CA  90024
 7      310/208-2800
        310/209-2348 (fax)
 8
      Jeffrey W. Lawrence
 9    Christopher P. Seefer
      MILBERG WEISS BERSHAD HYNES &
10      LERACH LLP
      100 Pine Street, Suite 2600
11    San Francisco, CA  94111
        415/288-4545
12      415/288-4534 (fax)

13    William S. Lerach                 * Joseph H. Weiss
      MILBERG WEISS BERSHAD HYNES &       Jack I. Zwick
14      LERACH LLP                        WEISS & YOURMAN
      401 B Street, Suite 1700            551 Fifth Avenue, Suite 1600
15    San Diego, CA  92101-5050            212/682-3025
        619/231-1058                       212/682-3010 (fax)
16      619/231-7423 (fax)

17

18    COUNSEL FOR DEFENDANTS

19    Boris Feldman
      WILSON SONSINI GOODRICH &
20      ROSATI, P.C.
      650 Page Mill Road
21    Palo Alto, CA  94304-1050
        650/493-9300
22      650/565-5100 (fax)

23  **Matthew Taylor
      140 Springside Road
24    Walnut Creek, CA  94694

25
        *Denotes service via U.S. mail on February 4, 2002.
26
       **Denotes service via hand delivery on February 4, 2002.
27

28
```

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL
SECURITIES LAWS- C-01-2659-CW                                          - 49 -