**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re TUT SYSTEMS, INC. SECURITIES LITIGATION | No.C 01-02659 CW |
| | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT AND GRANTING LEAVE TO AMEND |
| This Document Relates to: | |
| ALL ACTIONS | |

In this purported class action, Plaintiffs allege that Defendants engaged in a fraudulent scheme to inflate the value of Tut Systems, Inc. (Tut) stock.  In furtherance of this scheme, they allegedly made material misrepresentations about the company's business, failed to disclose defective products that were being recalled, improperly recognized revenue in violation of Generally Accepted Accounting Principles (GAAP), and engaged in insider trading.  Defendants move to dismiss Plaintiffs' consolidated class action complaint (CCAC) for failure to state a claim for securities fraud.  Plaintiffs oppose the motion.  The matter was heard on August 2, 2002. Having considered the papers filed by the parties and oral

argument on the motion, the Court GRANTS Defendants' motion to dismiss Plaintiffs' CCAC in part with leave to amend and DENIES it in part (Docket No. 42).

BACKGROUND[1]

Plaintiffs represent a class of persons and entities who purchased Tut securities between July 20, 2000 and January 31, 2001 (the Class Period).  Defendants are Tut and several of Tut's present and former executive officers.  During the Class Period, Defendant Salvatore D'Auria was Chairman, President and Chief Executive Officer (CEO), Defendant Nelson Caldwell was Vice President of Finance and Chief Financial Officer (CFO)[2], Defendant Allen Purdy was Vice President-Sales until his resignation on September 30, 2000, Defendant Sanford Benett was Chief Operating Officer (COO) until his resignation on November 30, 2000, and Defendant Matthew Taylor was Founder, Chief Technology Officer and Director until his resignation on January 19, 2001.  CCAC ¶¶ 17-19.

Tut sells broadband access systems that deliver high-speed data to multi-tenant buildings, allowing tenants access to high-speed data over existing telephone lines.  Tut went public in 1999, selling 2.875 million shares at $18 per share and raising $46 million.  In March, 2000, Tut completed a secondary offering, selling 2.5 million shares at $60 per share and

[1]All facts are taken from Plaintiffs' CCAC and all material allegations in the complaint are taken as true for purposes of this motion.

[2]Defendant Caldwell resigned from Tut in August, 2001, after the end of the Class Period.

2

raising an additional $141.7 million.  From 1998 to early 2000, Tut consistently reported revenues that met or exceeded targets reported by analysts.  During the Class Period, Tut's primary product was the Expresso System Platform.  In 2000, over 40% of Tut's revenues were generated by a few service providers including Trigem Infocom, Inc. (Trigem), Reflex Communications, Inc. (Reflex), and Darwin Networks, Inc. (Darwin), which accounted for 18%, 12% and 11% of net sales, respectively.  CCAC ¶¶ 2-3, 27, 29-31, 33.

I.   Product Recall

Former employees of Tut (confidential witnesses 1 through 4, or CW1 through CW4) have informed Plaintiffs that in the summer of 2000 Tut began to experience problems with the Expresso System Platform products that caused them to overheat and fail, which was brought to the attention of senior management, leading to a recall of Expresso System Platform products.  CW1, a former Director of Customer Service, stated the recall was instituted prior to August, 2000, and Defendants D'Auria, Caldwell, Benett, Purdy and others made the decision to recall the product.  The recall was not publicly disclosed.  Tut began to spot check the product before shipment.  However CW1 claims defective product continued to be shipped because Tut was not testing the product in the same environment in which the product was operating at customer sites.  CW1 also stated that the product problems were discussed at weekly staff meetings attended by Defendants D'Auria, Caldwell, Benett and other Tut executives, and that during the recall there were often two to

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

three meetings per day.  CCAC ¶¶ 4, 35, 38-44.

II.  Contingent Sales

According to Tut's former employees, some of Tut's largest customers, including Trigem, Darwin and Reflex, were not paying Tut as required by their contracts with Tut, received extended payment terms, were not required to pay for product until it was used, and were given the right to return unused product. Plaintiffs allege that Tut violated GAAP by recognizing revenues on contingent sales before their customers resold Tut's product and paid Tut.  CCAC ¶¶ 4, 35, 48-52.

Tut's sales to Darwin and Reflex were governed by Channel Partner Agreements (CPAs), which required them to pay Tut within thirty days of acceptance and provided that they could not return product to Tut after the expiration of the rejection period (fifteen business days from the date of delivery) without Tut's prior written consent.  CW1 stated that Trigem, Darwin and Reflex were not required to and did not pay Tut until they resold the product to their customers, and that Tut's large customers were allowed to and did return product they were unable to resell.  CW2, a former Regional Sales Manager, stated that Defendant D'Auria extended payment terms to Darwin, Reflex and CAIS Internet and continued to ship these customers product even though they had not paid for previous purchases.  CW4, a former Credit Manager, stated that Defendant Caldwell automatically gave Tut's large customers, such as Darwin, Reflex, CAIS Internet and Rycom, extended payment terms, and

4

United States District Court

For the Northern District of California

that Defendant Caldwell directed CW4 to ship product to nonpaying customers.  CCAC ¶¶ 4, 35, 48-50.

According to Plaintiffs, several of Tut's customers did not pay their accounts as required by their CPAs, and Tut's receivables increased and days sales outstanding (DSOs) deteriorated.  Receivables tripled from 1Q00 to 3Q00, increasing from $10.3 million as of March 31, 2000 to $15.4 million as of June 30, 2000 to $30.6 million as of September 30, 2000.  DSOs deteriorated from sixty-seven days as of June 30, 2000 to ninety-seven days as of September 30, 2000.  Plaintiffs allege that the increase in receivables and DSOs reflected the failure of Tut's customers to pay within thirty days of acceptance. CCAC ¶¶ 49-51.

Plaintiffs point in particular to $7.9 million in sales to Darwin in the first three quarters of 2000, all of which should have been paid to Tut within thirty days of acceptance pursuant to the CPA.  Plaintiffs claim that Darwin's bankruptcy proceedings reveal that Darwin did not pay Tut $5 million of that $7.9 million.  CCAC ¶ 52.

III.      Loss of Trigem and Sham Reflex Transaction

In July, 2000, Tut's largest customer, Trigem, informed Tut that it would no longer be purchasing Tut's products.  According to CW3, a former Customer Service Manager, Trigem stopped purchasing product from Tut in 3Q00.  Trigem did not generate any revenue for Tut in 3Q00.  CCAC ¶ 4, 53.

Plaintiffs allege that because of the product recall and loss of Trigem, Tut entered into a sham transaction with one of

United States District Court

For the Northern District of California

its largest customers, Reflex, during the third quarter of 2000, whereby Tut shipped $6.7 million of product to Reflex, much more than Reflex was required to purchase under its CPA with Tut and, Tut knew, much more than Reflex could use.  Reflex never paid for or used the product and declared bankruptcy shortly thereafter.  CCAC ¶ 6, 53-59.

Reflex accounted for $8.6 million of Tut's 2000 revenues, all of which was in the first three quarters, and $6.7 million of that was recognized in 3Q00.  Under the Reflex CPA, Tut agreed to sell Reflex its products at a forty percent discount provided that Reflex purchased a certain amount of product in each quarter: $600,000 in 4Q99, $900,000 in 1Q00, $1.2 million in 2Q00, $1.5 million in 3Q00, and $1.8 million in 4Q00.  In the first two quarters of 2000, Reflex purchased $1.9 million of Tut's products, a little less than the $2.1 million necessary to receive the discount under the CPA.   CCAC ¶ 6, 54-55.

On July 12, 2000, Tut purchased 1.3 million shares of Reflex preferred stock in a $33 million private placement.  Over the next several days in July, Tut sent Reflex invoices totaling approximately $1.9 million.  In August, 2000, Tut sent $4.1 million of product to Reflex, and in September another $650,000, for a total of $6.7 million in 3Q00, more than four times the amount required under the CPA for that quarter.  CCAC ¶ 56.

In July to August, 2000, CW1 asked a senior sales executive why Tut was shipping so much equipment to Reflex when CW1 knew Reflex couldn't use all of it, and the senior sales executive responded that because Tut was a shareholder in Reflex, Tut

could do whatever it wanted.  CW1 also recalled a similar conversation with a sales employee who commented that Reflex (as well as Darwin) didn't have a choice in the matter, saying, "If we tell them they have to take the merchandise, then they have to take it."  CCAC ¶ 57.

Further, according to CW4, Tut was shipping product to Reflex even though Reflex was not paying for the shipments. Tut's Aged Receivables Report filed in the Reflex bankruptcy shows that Reflex did not pay Tut $7.07 million for product purchased in 2000, including the $6.7 million shipped in 3Q00. Reflex did not pay Tut for any of the product shipped in 3Q00, and filed for bankruptcy shortly thereafter.  According to the Reflex Bankruptcy Trustee, much of the product sold to Reflex was never sold to Reflex's customers, remained in its original packaging, and was warehoused by Reflex.  CCAC ¶ 58.

Plaintiffs allege that Tut's sales to Reflex in 3Q00 were a sham, and that the improper recognition of revenue on the sales to Reflex, when Tut knew Reflex did not need and would not pay for the product, allowed Tut to announce inflated revenues in 3Q00.  Plaintiffs allege that Reflex is a "related party," and GAAP requires that Tut's financial statements disclose material transactions with Reflex.  CCAC ¶ 69(d).

IV.  Reserves for Obsolete and Excess Inventory

Plaintiffs claim that, during the Class Period, Tut failed adequately to reserve for returned defective products and obsolete inventory.  Plaintiffs allege that, due to the product

7

United States District Court

For the Northern District of California

recall, substantial amounts of recalled defective product were placed in warehouses by Tut. Tut's gross inventory increased from $12.8 million as of March 31, 2000 to $50 million as of December 31, 2000. However, Tut did not substantially increase its reserve for defective, obsolete and excess inventory, which ranged from $1.1 to $1.9 million from 1Q00 to 3Q00, until after the Class Period. CCAC ¶ 60.

V.   Reserves for Uncollectible Accounts Receivable

Plaintiffs allege that Defendants overstated Tut's earnings by failing to reserve for uncollectible receivables, when Defendants knew that Tut's customers were not paying for shipped product. CCAC ¶¶ 62-65.

According to CW4, in September, 2000 product shipments to Darwin and CAIS Internet were placed "on hold" because they had not paid Tut, and Reflex was shipped product in 3Q00 even though they were not paying Tut, as described above. CW4 also stated that Defendant Caldwell directed CW4 to ship product to Rycom in December, 2000 despite Rycom's $700,000 account being past due. CCAC ¶ 63.

Plaintiffs allege that Defendants knew about customer delinquencies, especially Reflex's, from Tut's Aged Receivables Report, and the increase and deterioration in receivables and DSOs. Plaintiffs claim Tut failed adequately to increase its bad debt reserve to account for its customers' failure to pay. Tut's bad debt reserve was $335,000 as of March 31, 2000, $537,000 as of June 30, 2000, and $543,000 as of September 30,

8

2000.  CCAC ¶¶ 63-65.

VI.  Allegedly False Statements Regarding 2Q00 and 3Q00, Stock Movement and Insider Trading

A.  2Q00 Results

Tut announced its 2Q00 revenues on July 19, 2000, stating revenues of $21 million and its first-ever pro forma profit. The press release quoted Defendant D'Auria, who stated in part: "Clearly, these kind of results show our business is accelerating beyond our expectations with a clear path for continued growth in future quarters."  Plaintiffs allege that Defendants knowingly misled analysts into serving as conduits for false information in reports dated July 20, 2000 repeating these financial results.  Tut's stock price rose from $68.25 on July 19, 2000 to close at $86.3125 on July 20, 2000.  CCAC ¶¶ 8, 66.

On July 27, 2000, Tut filed its 2Q00 Form 10-Q with the SEC, repeating the reported 2Q00 financial results.  The Form 10-Q contained the following statements:

Manufacturing or design defects in our products could harm our reputation and business.  Any defect or deficiency in our products could reduce the functionality, effectiveness or marketability of our products. . . .  To date, we have not experienced any significant loss from such defects nor do we believe that defects discovered during this or previous quarters could cause orders for our products to be canceled or delayed, reduce revenue, or render our product designs obsolete.    . . .  A majority of our sales comes from a small number of customers; if we lose any of these customers, our sales could decline significantly. . . . [A]ny material delay, cancellation or reduction of orders from [] major customers could cause our sales to decline significantly.

CCAC ¶ 68.

United States District Court
For the Northern District of California

Plaintiffs allege that the 2Q00 financial results and Form 10-Q were false and misleading because: (1) Tut improperly recognized revenues on sales of defective product that was returned pursuant to the recall, (2) Tut improperly recognized revenues on contingent sales to its largest customers (including Trigem and Darwin), (3) Tut failed adequately to reserve for obsolete and excess inventory and uncollectible accounts receivables, (4) Defendants knew about and failed to disclose the product recall, (5) Defendants knew and failed to disclose that Trigem would not buy any product from Tut in 3Q00, and (6) Tut failed to disclose the sham transaction with Reflex.  CCAC ¶¶ 8, 67-69.

B.   Insider Trading

Tut's stock continued to rise in July and August, 2000, reaching a high of $120.375 on August 29, 2000.  Between August 1 and August 24, 2000, the individual Defendants sold 188,100 shares, or 46.5% of their total available holdings (including vested options), for proceeds of more than $17 million at prices between $83.13 and $104.30.  Plaintiffs claim that Defendants sold their stock during the first three weeks of August with full knowledge of the undisclosed product recall, the loss of Trigem, and the sham transaction with Reflex.  CCAC ¶¶ 9, 70.

In September and October, 2000, Tut's stock declined, closing at $51.875 on October 17, 2000.

C.   3Q00 Results

On October 18, 2000, Tut announced record revenues of $28.6 million and earnings of $1.9 million for 3Q00, exceeding

10

analysts' expectations.  Tut's press release quoted Defendant D'Auria, who stated in part: "We are very proud to announce yet another successful quarter--our fifth consecutive quarter of triple digit growth . . .  Additionally, our revenue this quarter represented three times the revenue we reported a year ago--a great indication of our financial position and the demand for our product line."  Plaintiffs allege that Defendants knowingly misled analysts into serving as conduits for false information in reports dated October 19, 2000 repeating these financial results.  CCAC ¶¶ 75-76.

On November 14, 2000, Tut filed its 3Q00 Form 10-Q with the SEC, repeating the reported 3Q00 financial results.  The Form 10-Q repeated the statements quoted above in the 2QOO Form 10-Q that design defects and loss of customers could negatively affect the company.  However, while the 2Q00 Form 10-Q stated that no significant loss had occurred due to such design defects, the 3Q00 Form 10-Q omitted this statement.  CCAC ¶ 78.

Tut's stock continued to decline, closing at $36.875 on October 18 and at $27.75 on October 19, 2000.  CCAC ¶ 10.

Plaintiffs claim that the 3Q00 financial results and Form 10-Q were false and misleading for the same reasons that the 2Q00 results and accompanying statements were false and misleading, primarily the failure to disclose the product recall, the loss of Trigem, and the sham transaction with Reflex, a related party.  CCAC ¶¶ 76-79.

VII.    Pre-Announcements

Prior to announcing its 4Q00 revenues, Tut made two pre-

11

United States District Court

For the Northern District of California

announcements giving revised guidance and stating that it did not expect to meet analysts' expectations.  On November 30, 2000, Tut announced that it expected 4Q00 revenues to be lower than previously estimated, about $15-18 million, "due to various factors, including tightening in the capital markets, which have affected some of Tut's service provider customers."  In response to this announcement, Tut's stock fell to below $10 per share. CCAC ¶¶ 12, 80.

Tut hosted a conference call on November 30, 2000, at which Tut's management made statements to analysts.  Plaintiffs claim that these statements were made with the intention that they would be repeated in analyst reports.  One report stated that the "company was unwilling to answer any questions regarding aging receivables," and more than one report noted that Tut cited one customer who asked for a payment plan from Tut.  A report stated that "the company maintains its customers are all in solid financial condition," and reports also mentioned that aging receivables could be at risk, the company may need to restate sales from some accounts, DSOs are higher than previously, and the company may have higher than normal inventory levels in 4Q00.  CCAC ¶ 83-85.  Plaintiffs claim the statements made by Defendants at the conference call were false and misleading because Defendants failed to disclose the recall, Defendants knew that Tut's customers were not in solid financial condition, more than one of Tut's customers were not paying their bills, revenues would be much lower than estimated and charges for uncollectible receivables and worthless inventory

12

United States District Court

For the Northern District of California

would have to be taken.  CCAC ¶ 86.

On January 8, 2002, Tut issued a press release stating that the company expected revenues to be about $6-7 million instead of the $15-18 million previously anticipated.  The release stated: "The company cited rescheduling of orders and additional curtailing of credit availability as key reasons for the downturn."  It also stated that "the company anticipates that it will record significant additional balance sheet reserves including those related to allowances for doubtful accounts."  CCAC ¶ 87.  Plaintiffs claim this release was false and misleading because it concealed the product recall, failed to state that millions of dollars in reserves would be required for worthless inventory and uncollectible receivables, and concealed that Tut would incur additional expenses to reserve for its stock investments in Reflex and Darwin.  CCAC ¶ 88.

VIII. Disappointing 4Q00 Revenues, Charges and Write-Offs

On January 31, 2001, Tut announced its 4Q00 revenues of less than $6 million and a loss of $65.5 million.  Tut increased its bad debt reserve, which was approximately $500,000 during the Class Period, by $22.1 million.  Tut also announced it was incurring a $29.3 million charge for abandoned inventory and cancelled purchase orders, and a $3.1 million charge to write-off its equity investment in three customers (including Reflex and Darwin, who were in bankruptcy proceedings).  Tut's stock fell to as low as $5.84 after this announcement.  CCAC ¶ 13, 89.

In the three quarters after the end of the Class Period Tut's inventory reserve increased by more than $33 million, and

13

United States District Court

For the Northern District of California

Tut reported a net loss of $104.3 million for the year ending December 31, 2001.  CCAC ¶ 14, 61.

IX.  Plaintiffs' Claims

In the CCAC, Plaintiffs allege that Defendants committed securities fraud by (1) concealing the design and manufacturing defects with the Expresso System Platforms that caused them to overheat and fail, and failing to disclose the recall of all Expresso System Platforms in the summer of 2000, and (2) reporting fraudulent financial results for the second and third quarters of 2000, ending June 30, 2000 and September 30, 2000, respectively (2Q00 and 3Q00).  Plaintiffs claim that Defendants caused Tut to report inflated financial results in violation of GAAP by

(1) improperly recognizing revenues on sales of the defective product, (2) improperly recognizing revenues on contingent sales to its largest customers, including Trigem, Reflex and Darwin, (3) improperly recognizing revenues on the alleged sham transaction with Reflex when Tut had no expectation of payment, (4) failing adequately to reserve for uncollectible accounts receivable, and

(5) failing to reserve for obsolete and excess inventory.  CCAC ¶¶ 7, 36.

DISCUSSION

I.  Legal Standards

A.   Rule 12(b)(6)

A motion to dismiss for failure to state a claim will be denied unless it appears that the plaintiff can prove no set of

14

facts which would entitle it to relief.  See Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Fidelity Fin. Corp. v. Fed. Home Loan Bank of San Francisco, 792 F.2d 1432, 1435 (9th Cir. 1986). Dismissal of a complaint can be based on either the lack of a cognizable legal theory or the lack of sufficient facts alleged under a cognizable legal theory.  See Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1988).

All material allegations in the complaint will be taken as true and construed in the light most favorable to the plaintiff. See NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986).  However, "conclusory allegations without more are insufficient to defeat a motion to dismiss."  McGlinchy v. Shell Chem. Co., 845 F.2d 802, 810 (9th Cir. 1988).

Although generally a court may not consider material beyond the pleadings in ruling on a Rule 12(b)(6) motion, material which has been properly submitted as part of the complaint may be considered.  See Cooper v. Pickett, 137 F.3d 616, 623 (9th Cir. 1997); see also Durning v. First Boston Corp., 815 F.2d 1265, 1267 (9th Cir. 1987).  Moreover, "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss."  Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir. 1994).  A court may also consider documents which are not expressly incorporated into the complaint, but "upon which the plaintiff's complaint necessarily relies."  Parrino v. FHP, Inc., 146 F.3d 699, 706 (9th Cir. 1998).

15

When granting a motion to dismiss, a court is generally required to grant a plaintiff leave to amend, even if no request to amend the pleading was made, unless amendment would be futile.  See Cook, Perkiss & Liehe, Inc. v. Northern Cal. Coll. Serv. Inc., 911 F.2d 242, 246-47 (9th Cir. 1990).  In determining whether amendment would be futile, a court examines whether the complaint could be amended to cure the defect requiring dismissal "without contradicting any of the allegations of [the] original complaint."  Reddy v. Litton Indus., Inc., 912 F.2d 291, 296 (9th Cir. 1990).  Leave to amend should be liberally granted, but an amended complaint cannot allege facts inconsistent with the challenged pleading.  See id. at 296-97.

B.    Pleading Requirements

In 1995, Congress enacted the Private Securities Litigation Reform Act of 1995 (PSLRA), Pub. L. No. 104-67, which amends the Securities Exchange Act of 1934.  Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder make it unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."  15 U.S.C. § 78j(b); see also 17 C.F.R. § 240.10b-5 (Rule 10b-5).  To state a claim under § 10(b) and Rule 10b-5, a plaintiff must allege: "(1) a misrepresentation or omission of a material fact, (2) reliance, (3) scienter, and (4) resulting damages."  Paracor Fin. Inc. v. Gen. Elec. Capital Corp., 96 F.3d 1151, 1157 (9th

United States District Court

For the Northern District of California

16

Cir. 1996); see also McCormick v. Fund Am. Cos., 26 F.3d 869, 875 (9th Cir. 1994).

Plaintiffs must plead securities fraud with particularity, pursuant to Rule 9(b) of the Federal Rules of Civil Procedure. See In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1543 (9th Cir. 1994) (en banc) (GlenFed I). Further, although Rule 9(b) does not require that scienter be plead with particularity, see Concha v. London, 62 F.3d 1493, 1503 (9th Cir. 1995), the PSLRA does. See 15 U.S.C. § 78u-4(b)(2).

> 1. Circumstances Constituting Fraud

Rule 9(b) provides that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The allegations must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." Semegen v. Weidner, 780 F.2d 727, 731 (9th Cir. 1985). The PSLRA requires that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

Except with respect to allegations made on information and belief, the PSLRA pleading standard for allegations about the circumstances constituting fraud is the same as the Ninth

17

Circuit's pre-PSLRA standard under Rule 9(b). Before the enactment of the PSLRA, plaintiffs already were required to plead specifically the time, place and nature of the alleged misrepresentations, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1439 (9th Cir. 1987), and to explain why each alleged misstatement or omission was false or misleading when made, see GlenFed I, 42 F.3d at 1549.

The PSLRA's requirement regarding allegations plead on information and belief is somewhat stricter than the Ninth Circuit's pre-PSLRA standard. For allegations made on information and belief, pre-PSLRA case law in the Ninth Circuit required "a statement of the facts upon which the belief is founded," see Wool, 818 F.2d at 1439, but did not expressly require that plaintiffs specifically plead all facts upon which the belief was based. The PSLRA, however, requires exactly that. See 15 U.S.C. § 78u-4(b)(1).

2.    Scienter

The PSLRA provides that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Because the instant action alleges violations of § 10(b), the "required state of mind" is defined by § 10(b). See In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 975 (9th Cir. 1999).

Ninth Circuit case law prior to Silicon Graphics made clear that some forms of recklessness are sufficient to satisfy the

18

element of scienter in a § 10(b) action.  See Nelson v. Serwold, 576 F.2d 1332, 1337 (9th Cir. 1978).  Within the context of § 10(b) claims, the Ninth Circuit defines "recklessness" as

> a highly unreasonable omission [or misrepresentation], involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1569 (9th Cir. 1990) (en banc) (quoting Sundstrand Corp. v. Sun Chem. Corp., 553 F.2d 1033, 1045 (7th Cir. 1977)).  As explained by the Silicon Graphics court, recklessness, as defined by Hollinger, is a form of intentional conduct, not merely an extreme form of negligence.  See 183 F.3d at 976-77.  Thus, although § 10(b) claims can be based on reckless conduct, the recklessness must "reflect[] some degree of intentional or conscious misconduct." See id. at 977.  The Silicon Graphics court refers to this subspecies of recklessness as "deliberate recklessness." See id. at 977.[3]

---

[3]At least one district court in this circuit has concluded that the "deliberate recklessness" standard is a more stringent standard than the one set forth in Hollinger.  See In re Southern Pacific Funding Corp. Sec. Litig., 83 F. Supp. 2d 1172, 1177 (D. Or. 1999).  Although it recognized that "[t]here is language in [Silicon Graphics] that suggests that it is merely restating the standard set forth in Hollinger," the Southern Pacific court concluded that Silicon Graphics "raised the substantive standard applicable to § 10(b) claims."  See id. Read in that manner, Silicon Graphics overturns Hollinger. Because Hollinger was an en banc decision, while Silicon Graphics was not, this reading cannot be correct.  See United States v. Aguilar, 883 F.2d 662, 690 n.25 (9th Cir. 1989) ("a panel not sitting en banc has no authority to overturn Ninth Circuit precedent").  This Court therefore concludes that the "deliberate recklessness" standard in Silicon Graphics is the

United States District Court

For the Northern District of California

The PSLRA thus requires that a plaintiff plead with particularity "facts giving rise to a strong inference that the defendant acted with," at a minimum, deliberate recklessness. See 15 U.S.C. § 78u-4(b)(2); Silicon Graphics, 183 F.3d at 977. Facts that establish a motive and opportunity, or circumstantial evidence of "simple recklessness," are not sufficient to create a strong inference of deliberate recklessness. See 183 F.3d at 979. In order to satisfy the heightened pleading requirement of the PSLRA for scienter, plaintiffs "must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent." Id.

II.  Defendants' Motion to Dismiss the CCAC

Defendants move to dismiss the CCAC, arguing that Plaintiffs have failed to plead fraud with the particularity required by the PSLRA, and that Plaintiff have failed to plead the required level of scienter.

    A.    Particularity of Allegations Regarding Failure to
          Disclose Product Defects and Recall

Plaintiffs claim that statements made by Defendants throughout the Class Period were false and misleading because they failed to disclose the product problems that arose in the summer of 2000, and the ensuing recall. For the most part, the Court finds that these allegations plead fraud with sufficient particularity, for details regarding Defendants' knowledge of the product problems and recall, and failure to disclose, have been plead. For instance, Plaintiffs allege that Tut's 3Q00

same as the standard discussed in Hollinger.

United States District Court

For the Northern District of California

Form 10-Q misleadingly fails to disclose the product problems and recall because it states: "Manufacturing or design defects in our products could harm our reputation and business."  These and similar allegations are adequately plead.

However, the falsity of Defendants' July, 2000 statements is not adequately alleged, because it is not clear that Defendants were aware of the product defects and recall at that time.  Tut announced its 2Q00 results on July 19, 2000, and they were repeated in analyst reports published July 20, 2000, the first day of the Class Period.  Plaintiffs allege that Defendant D'Auria's representation in the July 19, 2000 press release that Tut's business was "accelerating beyond our expectations with a clear path for continued growth in future quarters" was knowingly false and misleading when made because of the product problems and the recall.  Tut filed its 2Q00 Form 10-Q with the SEC on July 27, 2000.  The 2Q00 Form 10-Q does not mention the product defects or recall, but states that "[m]anufacturing or design defects in our products could harm our reputation and business."

Plaintiffs claim that these statements were false or misleading because they fail to disclose the product defects and recall, but the only allegations in the CCAC regarding the timing of the defects and recall state that the recall began sometime in the summer of 2000, and prior to August, 2000.  It is likely that, even if the recall began at the very end of July, 2000, the product defects were known to Defendants by sometime in July, prior to the July, 2000 statements.  However,

21

the CCAC does not allege that Defendants knew of the product defects at the time of the July, 2000 statements, only that Defendants knew of the defects by the summer of 2000. Plaintiffs' allegations fail to establish with particularity that Defendants made the July, 2000 statements with knowledge of the product defects and recall, or with deliberate recklessness. Defendants' motion to dismiss these allegations is granted in part and denied in part, with leave to amend.  If Plaintiffs wish to allege that the July, 2000 statements were false and misleading because of the failure to disclose the product defects and recall, Plaintiffs must include particularized allegations that Defendants were aware of these events at that time.

B.    Particularity of Accounting Fraud Allegations

1.    Improper Revenue Recognition re: Defective Product

Plaintiffs allege that Tut improperly recognized revenue for 2Q00 and 3Q00 on sales of defective product, because Defendants knew that the Expresso System Platform contained significant design and manufacturing defects, leading to a recall of all of the product in the summer of 2000.  Given the recall, Plaintiffs claim that it was not probable that Tut would collect money from customers for sales of the Expresso System Platform, so revenue was improperly recognized.

To plead improper revenue recognition, a complaint must at the very least include allegations regarding the amount by which revenues and earnings were overstated due to the allegedly fraudulent transaction.  See Vantive, 283 F.3d at 1091 ("[T]here

22

is no sufficient allegation of the amounts by which revenues were allegedly overstated.") (citing <u>Greebel v. FTP Software, Inc.</u>, 194 F.3d 185, 204 (1st Cir. 1999) (noting that a "basic detail" in an accounting fraud allegation is the "approximate amount by which revenues and earnings were overstated.")).

The CCAC fails to allege the amount of product that was defective, how much was recalled and replaced, which customer or customers returned product and received new product in its place, when the recall occurred, how much revenue was recognized in connection with the defective product, and how this affected Tut's revenues in each of the two quarters at issue, 2Q00 and 3Q00. The CCAC alleges how much product was shipped to various customers during 3Q00, but it does not specifically allege shipments of knowingly defective product to specific customers, which is necessary to determine the amount by which Tut's revenues were overstated due to the defective product. For this reason, Plaintiffs' allegations regarding improper revenue recognition on defective product are insufficient.[4]

_____

[4]At one point, the CCAC alleges that <u>all</u> of the Expresso System Platform product was recalled, but no information regarding the extent of the recall is disclosed in later paragraphs describing the information provided to Plaintiffs by confidential witnesses. CCAC ¶ 35. When questioned on this point at oral argument, Plaintiffs' counsel claimed that the recall was "massive." This should be clarified in the amended complaint.

Defendants point out that Plaintiffs' allegation that Defendants knowingly shipped defective product is contradicted by Plaintiffs' allegation that Tut conducted spot checks of shipped product. Plaintiffs claim that Defendants knew the spot checks would not detect defective product, but the CCAC does not make this allegation. The CCAC only contains an assertion by CW1 that the spot checks in fact did not detect defective product, not that Defendants knew this or were deliberately

United States District Court

For the Northern District of California

**United States District Court**

For the Northern District of California

Further, the CCAC's allegations regarding Tut's 2Q00 revenues are particularly deficient, because, as discussed above, it is not clear from the allegations in the CCAC that the defects in the product had been discovered and the recall had been implemented by July 19, 2000, when Tut announced its 2Q00 revenues, or July 27, 2000, when Tut filed its 2Q00 Form 10-Q. Plaintiffs allege that the recall was instituted prior to August, 2000 (though Plaintiffs fail to allege the date more specifically). Plaintiffs must allege that the product defects were known prior to the July, 2000 statements regarding 2Q00 in order adequately to allege improper revenue recognition in 2Q00.

For these reasons, Defendants' motion to dismiss the accounting fraud allegations regarding shipments of allegedly defective product is granted with leave to amend.

2.    Improper Revenue Recognition re: Contingent Sales

Plaintiffs claim that Defendants improperly recognized revenues on contingent sales. The sales fall into two major categories, addressed below.

a.    Extended Terms, Rights of Return, Payment Upon Resale, and Failure to Pay

Plaintiffs allege that Tut improperly recognized revenue on contingent sales for which: (1) Tut had granted extended payment terms, (2) Tut had granted rights of return until the product

---

reckless in this regard. This should also be clarified in the amended complaint.

24

resold,[5] and (3) customers would likely not pay because they had failed to pay for earlier shipments. Plaintiffs have not plead with the required particularity the amount by which revenues were allegedly overstated due to these contingent sales. See Vantive, 283 F.3d at 1091. For example, no specific transactions have been identified (only a few specific customers), and the amount of the contingent sales has not been alleged. The CCAC does not include specifics regarding the extended payment terms and rights of return or explain why such terms caused revenues to be improperly recognized on those sales. Plaintiffs have adequately plead that certain customers were not paying Tut for product already shipped, but it would be preferable if Plaintiffs can allege with more particularity the amount and nature of the shipments sent to specific customers by Tut with knowledge of their past failure to pay. At a minimum, Plaintiffs' amended complaint must contain some allegation regarding the amount by which revenues were allegedly overstated due to the alleged contingent sales.

                    b.    "Sham" Reflex Transaction

    Plaintiffs' allegations regarding the Reflex transaction contain sufficient particularity to survive a motion to dismiss. Plaintiffs allege that Tut recognized revenue on $7 million of

---

[5]Defendants argue that Tut's customers are not resellers of Tut's product, because they owned and installed the product in buildings and offered internet access for a fee. This may merely be a matter of semantics (perhaps Tut permitted a right of return until customers installed and used the product), and on a motion to dismiss the Court takes the allegations in the CCAC as true. Plaintiffs may clarify this in their amended complaint.

*United States District Court*
For the Northern District of California

product shipments in 3Q00, even though Defendants knew that Reflex did not need the product and could not pay for it, and Reflex was granted extended payment terms.  These allegations satisfy the PSLRA's heightened pleading standard.

>           3.    Improper Accounting re: Failure to Adequately
>                 Reserve for Uncollectible Accounts Receivable
>                 and Obsolete and Excess Inventory

Plaintiffs allege that Defendants did not adequately reserve for uncollectible accounts receivable and obsolete and excess inventory.  The allegations regarding failure to reserve adequately are based on the allegations of the product defects and recall, and the failure of Tut's customers to pay for product.  These allegations contain adequate particularity to survive Defendants' motion to dismiss.

C.   Scienter

In order to satisfy the heightened pleading requirement of the PSLRA for scienter, plaintiffs "must state facts indicating no less than a degree of recklessness that strongly suggests actual intent."  Silicon Graphics, 183 F.3d at 979.

In the CCAC Plaintiffs allege that a strong inference of deliberate recklessness is created on the basis of the allegations of insider trading, actual knowledge on the part of Defendants of problems at Tut that were not disclosed, and the nature and extent of the alleged GAAP violations.

The Court will address each of these bases for scienter in turn.

1.   Insider Trading

Trading by an officer or director raises an inference of

26

United States District Court

For the Northern District of California

scienter only if the trades are "in suspicious amounts or at suspicious times" or "dramatically out of line with prior trading practices at times calculated to maximize personal benefit from undisclosed inside information."  Silicon Graphics, 183 F.3d at 987.  Among the relevant factors to consider in making this determination are: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history."  Id. at 986; see also Ronconi, 253 F.3d at 435.

Between August 1 and August 24, 2000, the individual Defendants sold 188,100 shares, or 46.5% of their total available holdings (including vested options), for proceeds of more than $17 million at prices between $83.13 and $104.30. Defendant D'Auria sold 55,100 shares of Tut stock for proceeds of $5.2 million, Defendant Caldwell sold 19,200 shares for proceeds of $1.78 million, Purdy sold 8,800 shares for proceeds of $779,055, Defendant Benett sold 5,000 shares for proceeds of $415,890, and Defendant Taylor sold 100,000 shares for proceeds of $8.9 million.  See CCAC ¶ 19.

Defendants' insider trading in August, 2000 appears in many respects to have been "calculated to maximize personal benefit from undisclosed inside information."  Silicon Graphics, 183 F.3d at 987.  Defendants sold during a narrow period of time in which Tut's stock was trading at all time highs, just before the

27

stock price began a long decline.[6]  However, this alone is not sufficient to give rise to a strong inference of scienter.

Plaintiffs in the CCAC have failed to provide the trading history of Defendants, in order to compare it to the August, 2000 stock sales alleged to be suspicious.  "When a complaint fails to provide us with a meaningful trading history for purposes of comparison, we have been reluctant to attribute significance to the defendant's stock sales."  In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1095 (9th Cir. 2002).  In the absence of such a comparison, it is impossible for the Court to determine whether the sales were suspicious in timing, amount, or percentage, or were "dramatically out of line with prior trading practices."  Ronconi, 253 F.3d at 435.

However, Defendants have provided prior insider trading information, in an effort to show that the August, 2000 sales were not suspicious or out of line with prior trading. Defendants present the following trading history: Defendant D'Auria sold 50,000 shares in 2Q00, prior to the Class Period; Defendant Caldwell sold 19,875 shares over two months in the first half of 2000; Defendant Taylor sold 75,000 shares in March and April of 2000; Defendant Purdy sold 10,000 shares in 1999; and Defendant Benett joined Tut in February, 2000 and had not previously sold any stock.  Cahill Exs. 15-19.  This trading history does not reduce the suspiciousness of the trading that

---

[6]The Court did not rely upon the Scott Hakala declaration attached to the CCAC to analyze Plaintiffs' insider trading allegations.

United States District Court

For the Northern District of California

occurred by all the Individual Defendants in a short period of time, at very high prices, in August, 2000.  Plaintiffs' insider trading allegations, which reveal that all of the Individual Defendants sold large portions of their holdings in a very short period of time while Tut's stock was trading at all-time highs, give rise to a strong inference of scienter, even in the light of their prior trading history.  Plaintiffs should include Defendants' trading history in the amended complaint.[7]

2.   Actual Knowledge of Recall, Sales of Defective Product, Contingent Sales, Uncollectible Accounts Receivable, and Obsolete and Excess Inventory

Plaintiffs allege that scienter may also be inferred based on Defendants' knowledge of the recall, as well as Defendants' knowledge that Tut was improperly recognizing revenue on contingent sales, and under-reserving for uncollectible accounts receivable and obsolete and excess inventory.

With regard to the recall, Plaintiffs' allegations are

---

[7]The Ninth Circuit has stated that "stock sales are helpful only in demonstrating that certain statements were misleading and made with knowledge or deliberate recklessness when those sales are able to be related to the challenged statements." Vantive, 283 F.3d at 1093.  In this case, the August, 2000 insider trading gives rise to a strong inference that Defendants acted with the requisite scienter both prior to and shortly after the insider trading.  The strong inference of scienter established through insider trading persists for a short period of time following the insider trading, because Defendants would have an interest in covering up the allegedly fraudulent statements made for the purpose of inflating Tut's stock for Defendants' personal gain.  It is reasonable to infer, in this case, that if Defendants made fraudulent statements with the requisite scienter in order to sell their stock at inflated prices, statements made shortly after the insider trading are related to that insider trading and were also made with the requisite scienter.  This is not true, however, with respect to the November, 2000 and January, 2001 pre-announcements, which occurred months after the insider trading.  See infra note 12.

29

United States District Court

For the Northern District of California

sufficient to give rise to a strong inference of scienter. Plaintiffs have alleged, through confidential witnesses, that everyone at Tut was aware of the product problems and recall, and that weekly and even multiple daily meetings were held with high-ranking officers, including some of the Defendants, regarding the progress of the recall.  These allegations give rise to a strong inference that Defendants knew about the product problems and recall, and failed to disclose the recall to the market.

With regard to the allegations of improper revenue recognition (on sales of defective product and contingent sales), Plaintiffs' allegations give rise to a strong inference of the required scienter.  Plaintiffs allege that Defendants sold product to customers and recognized revenue on sales to customers knowing the product sold was defective, and that Defendants recognized revenue on contingent sales (for which Tut granted extended payment terms, rights of return, etc.).  These allegations, supported by the confidential witnesses who worked in relevant positions at Tut, are sufficient to give rise to a strong inference that Defendants knew that they were improperly recognizing revenue on these sales, or were deliberately reckless in this regard.  Assuming that Plaintiffs can show falsity through accounting fraud (which, in this case, would likely be accomplished by proving violations of GAAP), the facts giving rise to the accounting fraud also tend to give rise to a strong inference of Defendants' knowledge of the improper

United States District Court

For the Northern District of California

accounting.[8]

Plaintiffs have also alleged facts that give rise to a strong inference of at least deliberate recklessness with regard to the reserves for uncollectible accounts receivable and obsolete and excess inventory.[9]  Plaintiffs have alleged that Defendants were aware that customers were not paying, and that Tut continued to ship product to customers whose accounts were delinquent.  Specifically, Plaintiffs alleged that Defendants knew about customer delinquencies, especially Reflex's, from Tut's Aged Receivables Report, and the increase and deterioration in receivables and DSOs (receivables tripled from $10.4 million as of March 31, 2000 to $30.6 million as of September 30, 2000, and DSOs deteriorated from sixty-seven days as of June 30, 2000 to ninety-seven days as of September 30, 2000).  Further, Plaintiffs allege that the recall caused Tut's

---

[8]Generally, violations of GAAP, alone, do not give rise to a strong inference of scienter.  As Judge Alsup stated, "With accounting fraud, however, the necessary scienter is in general not established merely by the publication of inaccurate accounting figures, or failure to follow generally accepted accounting principles.  More is needed."  In re NorthPoint Communications Group, Inc. Sec. Litig., 184 F. Supp. 2d 991, 998 (N.D. Cal. 2001).  In this case, however, the facts giving rise to accounting fraud and those giving rise to a strong inference of scienter significantly overlap.  In other words, Plaintiffs have alleged that Defendants knowingly violated GAAP by improperly recognizing revenue on sales of defective product and contingent sales.  Proof of this allegation would prove both falsity (accounting fraud) and scienter (knowledge or deliberate recklessness).

[9]Again, falsity and scienter overlap, for the same allegations that indicate that Tut in fact failed adequately to reserve for uncollectible accounts receivable and obsolete and excess inventory also indicate that Defendants were aware of this failure.

obsolete inventory to swell, and that Defendants were aware of this because of their knowledge of the recall.  Plaintiffs also point to the striking increase in Tut's reserves for uncollectible accounts receivable and obsolete and excess inventory in conjunction with the announcement of disappointing 4Q00 results and throughout 2001.[10]  These allegations give rise to a strong inference that Defendants knew during the Class Period that Tut was under-reserving for uncollectible accounts receivable and obsolete and excess inventory.

To the extent that Plaintiffs are able to plead falsity with the requisite level of particularity as to these issues, a strong inference of scienter exists.

C.   Pre-Announcements

The pre-announcements made in November, 2000 and January, 2001 do not appear to contain any false or misleading statements.  Plaintiffs allege that the pre-announcements are misleading because they do not disclose the product recall and other problems at Tut.  However, the pre-announcements do not address these issues, but simply state that Tut's revenues will be lower than previously expected.  To allege fraud with particularity, Plaintiffs must point to particular statements that are made false or misleading by the alleged omissions.  Plaintiffs have failed to do so with respect to the pre-announcements.

_____

[10]The fact that Tut has never restated its financial results does not, as Defendants suggest, weaken the inferences that may be drawn from the facts alleged by Plaintiffs.

32

United States District Court

For the Northern District of California

Plaintiffs claim that the January, 2001 pre-announcement understated and downplayed the nature and extent of the reserves that would need to be booked for 4Q00. "If the challenged statement is not false or misleading, it does not become actionable merely because it is incomplete." Vantive, 283 F.3d at 1085; see also Brody v. Transitional Hosps. Corp., 280 F.3d 997, 1005-06 (9th Cir. 2002). Plaintiffs fault Defendants for failing to provide more details regarding the extent of the reserves that would need to be booked for 4Q00. However, Defendants' failure to disclose more specific information at an earlier date does not amount to fraud.

Plaintiffs also allege that Defendants stated in a November 30, 2000 conference call that their customers were in solid financial condition, when in fact Tut's customers were not paying their bills. This allegation of falsity in connection with the November 30, 2000 pre-announcement is sufficient.

However, Plaintiffs have failed to make particularized allegations of the requisite level of scienter with respect to the pre-announcements.[11]  Plaintiffs have not alleged that any insider trading occurred close in time to the pre-

---

[11]To the extent that the statements claimed to be fraudulent are forward-looking statements forecasting Tut's revenues, the level of scienter is higher and Plaintiffs must allege facts that would create a strong inference that Defendants made the pre-announcements with "actual knowledge . . . that the statement[s were] false or misleading" when made.  15 U.S.C. § 78u-5(c)(1)(B)(I).

33

United States District Court

For the Northern District of California

announcements.[12]  Further, the pre-announcements constituted warnings to the market that Tut's revenues would not be as high as previously estimated--there is simply no reason to draw from such negative warnings any inference of fraudulent conduct.  In fact, Tut's stock dropped after these negative pre-announcements.  Nothing about the pre-announcements gives rise to any inference of scienter, even if they were fraudulent or misleading.  In particular, even if Plaintiffs could allege falsity, Plaintiffs have failed to allege facts giving rise to a strong inference that Defendants knew, at the time of the pre-announcement regarding reserves in early January, 2001, the exact amount and extent of those reserves, and knowingly understated them.  Therefore, Defendants' motion to dismiss the allegations regarding the pre-announcements is granted. Plaintiffs are granted leave to amend.

        D.   Statements in Analyst Reports

        Plaintiffs' allegations regarding misleading statements made by third-party analysts do not provide, for the most part, any reason to attribute those statements to Defendants.  A defendant can be held liable for false or misleading statements made by a third-party analyst if the defendant either expressly or impliedly adopts or endorses the statements, see In re Syntex Corp. Sec. Litig., 95 F.3d 922, 934 (9th Cir. 1996), or provides the analyst with false or misleading information with the intent

---

[12]The August, 2000 insider trading is too remote in time to give rise to a strong inference of scienter with respect to the November, 2000 and January, 2001 pre-announcements.  See supra note 7.

34

that the analyst will communicate that information to the market (the conduit theory), see Cooper, 137 F.3d at 624; Warshaw v. Xoma Corp., 74 F.3d 955, 959 (9th Cir. 1996).

Plaintiffs do not plead that Defendants endorsed or adopted the analysts' statements, and do not plead the conduit theory with the requisite particularity except in the case of the November 30, 2000 conference call in conjunction with the November 30 pre-announcement (i.e., the analyst report stating that "the company maintains its customers are all in solid financial condition" can be attributed to Defendants). However, the Court has dismissed the pre-announcement statements for failure to plead the requisite level of scienter. This applies to the statements to analysts as well.

CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion to dismiss Plaintiffs' CCAC in part, and DENIES it in part. Plaintiffs may file an amended complaint within twenty days of the date of this Order. Defendants shall answer or timely notice a motion to dismiss for November 1, 2002 at 10:00 a.m. A case management conference shall be held at that time whether or not a motion to dismiss is filed.

IT IS SO ORDERED.

Dated: 8/15/02                          /s/ CLAUDIA WILKEN
                                        CLAUDIA WILKEN
                                        United States District Judge

35